307 P.3d 1174

Daniel K. KANAHELE, Warren S. Blum, Lisa Buchanan, James L. Conniff, and Cambria Moss, Petitioners/Plaintiffs–Appellants,

v.

MAUI COUNTY COUNCIL and County Of Maui, Respondents/Defendants–Appellees,

and

Honua'ula Partners, LLC, Respondent/Defendant–Intervenor–Appellee.

No. SCWC–29649.

Supreme Court of Hawai'i.

Aug. 8, 2013.

As Corrected Aug. 30, 2013.

Lance D. Collins for petitioner.

Mary Blaine Johnston for respondents Maui County Council and County of Maui.

Jonathan H. Steiner, Honolulu, for respondent Honua'ula Partners, LLC.

RECKTENWALD, C.J., NAKAYAMA, ACOBA, McKENNA, and POLLACK, JJ.

Opinion of the Court by POLLACK, J.

Petitioners/Plaintiffs–Appellants Daniel K. Kanahele, Warren S. Blum, Lisa Buchanan, James L. Conniff, and Cambria Moss (collectively "Petitioners") seek review of the Octo-

ber 19, 2012 Judgment on Appeal of the Intermediate Court of Appeals (ICA),[1] filed pursuant to its June 29, 2012 Summary Disposition Order, affirming the January 22, 2009 judgment entered by the Circuit Court of the Second Circuit (circuit court)[2] in favor of Respondents/Defendants–Appellees Maui County Council (MCC) and the County of Maui and Respondent/Defendant–Intervenor–Appellee Honua'ula Partners, LLC (Honua'ula), and against Petitioners.

Petitioners, who are residents of Maui, filed this appeal based on the MCC's passage of two bills related to the development of a residential community on 670 acres of land located in Wailea, Maui (Wailea 670 project). The Wailea 670 project consists of developing a golf course, single- and multifamily residences, recreation and open spaces, and village mixed-use sub-districts. Honua'ula is the owner and developer of the land in question. The MCC and its committee, the Land Use Committee (LUC), passed two bills (Wailea 670 bills) in connection with the Wailea 670 project. Petitioners filed suit in the circuit court challenging this passage, arguing that the MCC and LUC failed to satisfy the requirements of the State open meetings law, Hawai'i Revised Statutes (HRS) Chapter 92, Part I, commonly known as the "Sunshine Law."

## I. BACKGROUND

The Wailea 670 project has been in the planning stages since 1986. The LUC's first public meeting on the project took place in February 2002, followed by meetings in January (site visit), March, June, July and October of 2006 and January, March, July, September, October and November of 2007. At issue in this case is the series of thirteen LUC meetings convened between October 18, 2007 and November 20, 2007, when the LUC passed the Wailea 670 bills for consideration by the MCC, as well as the four meetings held by the MCC in February and March 2008, prior to the MCC's final passage of the bills on March 18, 2008.

### A. LUC and MCC meetings

#### 1. October 18, 2007 meeting

On October 11, 2007, the LUC filed a "Meeting Agenda" with the Office of the County Clerk for a meeting to take place on October 18, 2007 at 9:00 a.m. The agenda identified the subject matter of the meeting as "LU–38 CHANGE IN ZONING AND PROJECT DISTRICT PHASE I APPROVAL FOR 'HONUA'ULA/WAILEA 670' RESIDENTIAL DEVELOPMENT." The agenda provided that the LUC was in receipt of two proposed bills that it would be considering; one bill would repeal Chapter 19.90 of the Maui County Code and establish a new Chapter 19.90A (Project District bill) and the second bill would repeal Ordinance No. 2171 (1992) and establish conditional zoning for the 670 acres of land involved in the project (Change in Zoning bill). The agenda also stated that oral or written testimony on any agenda item would be accepted.

The minutes for the October 18 meeting reflect that forty people attended the meeting, in addition to the LUC members, staff and certain named individuals.[3] Approximately twenty-eight people testified at the meeting, including Petitioners Conniff and Kanahele. Each person was given approximately four minutes to speak.

The LUC closed the public testimony portion of the meeting after everyone who had submitted requests to testify had done so. The LUC began deliberating at 2:40 p.m. At 4:55 p.m., LUC Chair Michael J. Molina an-

---

1. The Honorable Craig H. Nakamura, Chief Judge, the Honorable Alexa D.M. Fujise, and the Honorable Lisa M. Ginoza, presiding.

2. The Honorable Joseph E. Cardoza, presiding.

3. For each meeting, the minutes reflect who was present. The council members, staff, administrators, and certain individuals such as Charles Jencks, Honua'ula's representative, attorneys for Honua'ula, and Honua'ula's entitlement consul-

tant are listed by name. There is also a notation for "additional attendees." For the October 18, 2007 meeting, the minutes reflected that there were forty additional attendees. For most of the twelve LUC reconvened meetings, there were between five and ten additional attendees. However, it is unknown whether the additional attendees were present in connection with the named individuals or were members of the general public.

nounced, "This meeting for October 18th, 2007, related to LU–38 is in recess until Monday morning, October 22nd, 9:00 a.m., here in the Council chambers."

No new agenda was posted for the October 22 reconvened meeting. There is nothing in the record indicating that the date and time of the continued hearing was posted at the Council's chambers or at any other location.

The October 22, 2007 reconvened meeting began at 9:07 a.m. The record does not reflect any discussion among the LUC members regarding whether the public had been given any notice of the meeting aside from the oral announcement at the conclusion of the prior meeting. At the beginning of the meeting, Chair Molina announced that the board would take a break at 1:00 p.m. and "come back a little later in the afternoon," at around 3:30 p.m. because "we have some Members that have to leave for some prior commitments." Chair Molina continued, "For the public's information, this is an off-week and Members do make prior commitments to address other matters in our community.... And, so, that is why today ... we have somewhat [sic] of an unusual schedule and how we will proceed."

The meeting was recessed at 12:51 p.m. and then reconvened again at 3:50 p.m. Chair Molina explained that although the plan had been to meet until 5 p.m. that day, the LUC only had a "bare quorum" present and therefore it was his opinion that it would be better to reconvene at another date and time.[4] He announced, "So, with that being said, this meeting is in recess until tomorrow, Tuesday, October 23rd, 9:00 a.m., right here in the

Council Chambers." The meeting was recessed at 3:53 p.m.

The meeting, which had been initially noticed for October 18, 2007, was reconvened and then continued successively in the same manner on October 23, 25, 29, November 1, 5, 7, 8, 13, 16, 19, and 20. Thus the October 18 meeting was continued and reconvened twelve times until the final meeting on November 20. The circuit court entered a finding that each meeting was reconvened "due to time constraints or the loss of quorum."

During this time that the LUC reconvened twelve meetings, the LUC met twice, on October 31, 2007 and November 14, 2007, in order to consider unrelated permit applications. The LUC posted agendas for both meetings.

For the Wailea 670 bills, no new agendas were posted for the twelve reconvened meetings. At the end of each meeting, the LUC would announce the new date, time and place for the reconvened meeting. There is no indication in the record that the LUC gave any other form of public notice for the meetings.

The LUC employed two criteria in determining when to schedule the next continued meeting; the availability of the committee members, and the LUC's belief, expressed on at least three separate occasions, that the continuance was required to be held within five days.[5] The result was that the continued meetings were scheduled in an unpredictable manner.[6] Meetings were scheduled in the mornings, afternoons, and evenings

---

4. Five members of the nine-member Council constitute a quorum. Charter of the County of Maui (CCM) § 3–5(4) (2013), *available at* http://www.co.maui.hi.us/documents/24/197/Charter%20(2013%20Edition)_201303212115480964.pdf. "Unless otherwise provided ..., no action of the council shall be valid or binding unless adopted by a vote of five or more members of the council." *Id.*

5. For example, at the end of the October 25, 2007 reconvened meeting, during the members' discussion of scheduling the next meeting, Chair Molina stated, "The only options we have as far as recess dates I'm looking at, it's either the 29th or the 30th." An LUC member commented, "[I]t's too bad that the number of days required

to recess ends on the 30th, because the following day, ... that would have been ideal to continue," to which Chair Molina responded, "Yeah, it's unfortunate."

6. The reconvened meeting times were as follows, excluding recesses taken throughout the meetings: October 22, 2007 (9:07 a.m. to 3:53 p.m.); October 23 (9:12 a.m. to 4:15 p.m.); October 25 (9:04 a.m. to 10:50 a.m.); October 29 (5:36 p.m. to 8:49 p.m.); November 1 (1:33 p.m. to 5:33 p.m.); November 5 (9:07 a.m. to 3:50 p.m.); November 7 (9:06 a.m. to 3:11 p.m.); November 8 (1:35 p.m. to 3:44 p.m.); November 13 (5:32 p.m. to 9:40 p.m.); November 16 (1:40 p.m. to 1:48 p.m.); November 19 (9:15 a.m. to 4:04 p.m.); November 20 (2:35 p.m. to 4:24 p.m.).

and varied significantly in length. In addition, many meetings were scheduled back-to-back, or only one or two days hence.

The transcripts of the meetings do not reflect any discussion or consideration of whether the continued date and time would be convenient or reasonable for the public to attend.

The circuit court found that during the twelve reconvened meetings, "the LUC considered reports and other documents and information related to the Wailea 670 Bills." The circuit court found that "[t]he deliberation process from October 22 through November 20, 2007 encompassed over 45 hours of deliberation by the LUC as part of the decision making process." (Emphasis added).

After October 18, 2007, no further oral testimony from the public was received by the LUC. With the exception of two meetings (November 13 and 16), the LUC members sought and received extensive input from Mr. Jencks, Honua'ula's representative. Mr. Jencks was present at every reconvened meeting.

At the conclusion of the final reconvened meeting on November 20, 2007, the LUC approved the Wailea 670 bills and forwarded them to the MCC for formal consideration. The LUC prepared a report to the MCC and recommended that the MCC pass the Wailea 670 bills on first reading.

2. February 8, 2008 meeting

The agenda for the MCC meeting of February 8, 2008, listing the first reading of the Wailea 670 bills as an agenda item, was filed with the County Clerk's office on February 1, 2008.

Prior to the February 8 meeting, MCC Chair Riki Hokama distributed three memoranda, all dated February 7, 2008, to the other MCC members. The first memorandum detailed floor amendments relating to the wastewater component of the Change in Zoning bill that Hokama intended to propose at the February 8 meeting. Hokama explained the substance of the proposed amendments and detailed the language that

he proposed to add to, or delete from, the bill.

Chair Hokama's second memorandum detailed two proposed amendments, also related to the water component of the Change in Zoning bill, which would require Honua'ula to offer the County the right to purchase the water system it develops at the cost of development, and also require that the water rates for the residential workforce housing units be no higher than the water rates set by the County.

His third memorandum detailed a proposed amendment to clarify that the maximum number of dwelling units referenced in the Project District bill includes any offsite residential workforce housing units. All three memoranda concluded, "I would appreciate your favorable consideration of these proposed floor amendments. Should you have any questions, please contact me or the Committee staff[.]" The names and extension numbers of two staff members were also included.

Member Michelle Anderson also sent a memorandum dated February 8, 2008, to Chair Hokama and the other MCC members, detailing three amendments to the Change in Zoning bill that she intended to propose at the upcoming meeting. The amendments would require Honua'ula to provide a bond and annual compliance reports to the MCC, and require that all residential units in the project be constructed to meet applicable Energy Star requirements. Each proposed amendment was followed by a section titled "Justification," which detailed Anderson's rationale for the proposals. The memorandum ended, "I would appreciate your favorable consideration of these proposed floor amendments. Should you have any questions, please contact me."

Chair Hokama's three memoranda and Anderson's memorandum contained notations indicating that in addition to being sent to the other MCC members, copies were sent to the County Clerk, Director of Council Services, Planning Director, and Corporation Counsel.

Public oral testimony was taken at the February 8, 2008 meeting, including oral tes-

timony by Petitioners Kanahele, Buchanan, and Conniff. All individuals who submitted requests to testify were given the opportunity to do so before Chair Hokama closed the oral testimony portion of the meeting. The MCC did not consider any of the proposed amendments detailed in Chair Hokama and Member Anderson's memoranda during the February 8 meeting. At 5:02 p.m., Chair Hokama announced, "The Council shall stand in recess, till 9:00 a.m. Monday morning [February 11], when we shall reconvene in these chambers."

No new agenda was posted for the February 11, 2008 meeting.

Prior to the February 11 meeting, Member Anderson prepared two memoranda, both dated February 11. The first memorandum set forth five amendments to the Project District bill that Anderson intended to propose at the February 11 meeting. The first three amendments sought to clarify the percentage of dwelling units that would be constructed, phase the development of dwelling units to minimize the impact on traffic during construction, and incorporate by reference the conceptual land use map for the project. The fourth and fifth amendments concerned the "grading of the project site and native Hawaiian access trails."

Anderson's second memorandum detailed two amendments to the Change in Zoning bill that she intended to propose at the February 11 meeting. One amendment concerned a timeframe for the widening of a highway prior to the commencement of construction. The second amendment sought to "re-describe the conservation easement" on the project site and to "allow for title to the conservation easement to be conveyed to a land trust."

Both of Anderson's memoranda concluded in a manner identical to Chair Hokama's February 7 memoranda, by stating, "I would appreciate your favorable consideration of these proposed floor amendments. Should you have any questions, please contact me or

the Committee staff[.]" The names and extension numbers of two staff members were also included. The memoranda contained notations indicating that copies were sent to the County Clerk, Director of Council Services, Planning Director, and Corporation Counsel.

At the February 11 reconvened meeting, the MCC considered the proposed amendments. During the MCC's consideration of the amendments, the members were asked to reference the memoranda that had been distributed.[7]

The MCC voted to adopt all of the proposed amendments. Among the amendments passed unanimously was Anderson's amendment to the Change in Zoning bill, to add a condition requiring Honua'ula to provide a bond or cash deposit to the MCC in an amount that would assure compliance with the zoning conditions.

Chair Hokama then asked Mr. Jencks to come forward to "provide comment" on the amendments. Mr. Jencks went through each amendment that had been passed that day and made suggestions or indicated Honua'ula's position on the amendment. Mr. Jencks was specifically asked to comment on the February 8 and February 11 memoranda distributed by Member Anderson and the amendments proposed therein, which he did by referencing specific sentences from the memoranda. He asked the MCC to "reconsider" certain amendments that had been passed. For example, Mr. Jencks stated that the bond requirement would be "impossible" to comply with, due to the difficulty in estimating the value of future work and his inability to obtain a bond until the construction drawings were completed, which he estimated would take five years.

Towards the end of the meeting, Chair Hokama suggested that the MCC either pass the bills on first reading or recess the meeting. Chair Hokama stated, "And the Chair expects any proposed revision shall be completely written up in advance of the meeting reconvening for the courtesy of the other

---

7. For example, before consideration of Member Anderson's proposed amendments, Chair Hokama stated, "I'd like to refer you now to the remaining three different communications from ... Ms. Anderson, regarding proposed amend-

ments. The first one I would ask is that you refer to the February 8 memorandum from her to you, Members, so if you can have that before you for consideration[.]"

Members to review so that we can take votes and make a determination on this application." Chair Hokama announced a recess of the meeting until February 14, 2008.

No new agenda was posted for the February 14 meeting.

Prior to the February 14 meeting, four MCC Members prepared and distributed a total of eight memoranda to the other Members. The memoranda contained notations indicating that copies were sent to the County Clerk, Director of Council Services, Planning Director, and Corporation Counsel.

Member Michael J. Molina prepared three memoranda, dated February 13, 2008. The first memorandum stated that he intended to propose reconsideration of the Council's vote to adopt the bond requirement for the Change in Zoning bill, citing Mr. Jencks' comments at the February 11 meeting. Molina stated that if his motion for reconsideration was carried, then the bill would return to the point when Anderson's motion to amend the bill to include the bond requirement was pending. Molina's second memorandum stated that he intended to propose reconsideration of the MCC's vote to add a new condition relating to energy systems, again citing Mr. Jencks' comments. The third memorandum proposed another reconsideration of the MCC's vote on grading, in order to incorporate revisions requested by Mr. Jencks.

Member Anderson also prepared and distributed three memoranda, dated February 13, 2008. The memoranda detailed Anderson's proposed motion to reconsider the MCC's vote approving the bond requirement, citing Mr. Jencks' concerns at the prior meeting. Contrary to Molina's motion to reconsider and rescind the amendment entirely, Anderson proposed reconsidering the vote and amending the primary motion to permit the bond to be provided in four five-year phases. Anderson also moved to reconsider the MCC's vote on the grading condition and to replace one of the maps that had been attached to the Change in Zoning bill, in light of Mr. Jencks' comments. The memoranda on grading and the map were accompanied by a separate "Justification Sheet,"

detailing Anderson's rationale for her motions.

Member Bill Medeiros distributed a memorandum, dated February 13, 2008, setting forth his intent to move for reconsideration of the MCC's votes related to the wastewater treatment and sewage disposal conditions of the Change in Zoning bill, also citing Mr. Jencks' concerns.

Member Gladys Baisa distributed a memorandum, dated February 13, 2008, regarding her proposed motion to reconsider the amendment to the Project District bill, which limited the number of dwellings permitted to be constructed in the project district per year, again citing Mr. Jencks' comments.

All eight memoranda distributed concluded with the same phrase: "I would appreciate your favorable consideration of my proposal(s). Should you have any questions, please contact me or the Committee staff[.]" According to Chair Hokama's deposition testimony, all of the memoranda distributed were "prepared as a matter of courtesy."

On February 14, 2008, the meeting was reconvened at 9:05 a.m. At one point during the Members' discussion of Member Medeiros' motion to reconsider the MCC's vote requiring Honua'ula to construct a wastewater transmission system and a reclaimed water system, Member Anderson expressed her confusion over the motion. When Anderson asked to clarify the motion to reconsider proposed by Medeiros, Chair Hokama responded, "Yeah, so, . . . you have his proposal, and you must . . . just take what he has presented, Ms. Anderson, as part of his communication to the Members."

Several of the proposed motions for reconsideration were passed with no discussion (other than stating the proposed motion) prior to voting on the motion. For example, Member Molina's motion to reconsider the MCC's vote regarding the bond requirement was passed unanimously with no discussion on the merits of reconsidering the vote.

At the conclusion of the February 14 meeting, the MCC voted to pass the Wailea 670 bills on first reading.

### 3. Circuit court proceedings initiated

On March 5, 2008, Petitioners filed a complaint in the circuit court against the MCC and County of Maui, alleging violations of the Sunshine Law. Petitioners stated that the circuit court had subject matter jurisdiction over the claims for relief pursuant to HRS §§ 603–21.5,[8] 92–12 [9] and 92–13.[10]

Petitioners alleged that the LUC "did not accept public testimony and did not file and post a notice of the meeting" for the LUC meetings held between October 22, 2007 and November 20, 2007. Additionally, Petitioners stated that during those meetings, the LUC "reviewed, discussed and deliberated information that was not available at the October 18, 2007 meeting[.]" Petitioners called the LUC's November 20, 2007 decision to pass the proposal out of committee for first reading before the MCC the "First Disputed Action."

Petitioners also alleged that the MCC "did not accept public testimony and did not file and post a notice" for the meetings held on February 11 and 14, 2008.

Petitioners asserted that "[o]n or before February 8, 2008, several members of [the MCC] transmitted and circulated to each other proposed amendments to the February 8 Agenda Proposed Action," and that these written communications were done "before and outside the noticed February 8 meeting." Petitioners called these written communications the "Second Disputed Action."

Petitioners further alleged that MCC members transmitted and circulated proposed amendments to the February 8 proposed action prior to the meeting on February 14, 2008, and that these written communications were done outside of a noticed meeting. These communications were called the "Third Disputed Action."

The complaint concluded with the following request for a judgment against the MCC:

> Wherefore Plaintiffs pray and demand judgment against defendants <u>voiding actions taken at the November 20, 2007 meeting and the February 14, 2008 meeting</u>, including the First, Second and Third Disputed Action, inconsistent with Haw. Rev.Stat. 92–3, Haw.Rev.Stat. 92–7 and therefore void and an award of reasonable attorney's fees and costs.

(Emphasis added).

On March 11, 2008, Petitioners filed a Motion for Preliminary Injunction. Petitioners moved for an injunction staying any actions by the MCC related to the November 20, 2007 and February 14, 2008 decisions. The hearing on the motion was scheduled for April 8, 2008.[11]

---

**8.** HRS § 603–21.5(a)(3) (Supp.2008) provides that the circuit courts generally have jurisdiction over civil actions and proceedings.

**9.** HRS § 92–12 (1993) constitutes the enforcement provision of the Sunshine Law and provides:

(a) The attorney general and the prosecuting attorney shall enforce this part.
(b) The circuit courts of the State shall have jurisdiction to enforce the provisions of this part by injunction or other appropriate remedy.
(c) Any person may commence a suit in the circuit court of the circuit in which a prohibited act occurs for the purpose of requiring compliance with or preventing violations of this part or to determine the applicability of this part to discussions or decisions of the public body. The court may order payment of reasonable attorney's fees and costs to the prevailing party in a suit brought under this section.
(d) The proceedings for review shall not stay the enforcement of any agency decisions; but the reviewing court may order a stay if the following criteria have been met:

(1) There is likelihood that the party bringing the action will prevail on the merits;
(2) Irreparable damage will result if a stay is not ordered;
(3) No irreparable damage to the public will result from the stay order; and
(4) Public interest will be served by the stay order.

HRS § 92–12 was amended in 2012 to add a provision that "[o]pinions and rulings of the office of information practices shall be admissible in an action brought under this part and shall be considered as precedent unless found to be palpably erroneous." 2012 Haw. Sess. Laws Act 176, § 3 at 616.

**10.** HRS § 92–13 (1993) provides that "[a]ny person who willfully violates any provisions of this part shall be guilty of a misdemeanor, and upon conviction, may be summarily removed from the board unless otherwise provided by law."

**11.** Petitioners' March 11, 2008 Ex Parte Motion to Shorten Time for Hearing on Motion for Preliminary Injunction was denied by the circuit court.

#### 4. March 18, 2008 MCC meeting

On March 11, 2008, the MCC posted an agenda for a meeting scheduled for March 18, 2008. The agenda provided that the MCC would conduct a second and final reading of the Wailea 670 bills.

On March 18, 2008, public oral testimony was taken from the start of the meeting at 9:03 a.m. until 4:07 p.m., when all members of the public who came to testify had completed their testimony. Petitioners Conniff, Kanahele, and Buchanan testified during this meeting. In total, approximately forty-eight members of the public testified in regard to the Wailea 670 bills. Each person was given approximately three minutes to speak.

After the close of public testimony and the consideration of several unrelated bills, the MCC considered the Change in Zoning bill. The MCC considered several motions for amendments to the bill, all of which were defeated.

Two of the motions considered were brought pursuant to recommendations by the U.S. Fish and Wildlife Service. The first motion by Chair Hokama moved to amend the conditions of zoning to require Honua'ula to prepare an assessment of the development's impact on certain native species. During the discussion, Chair Hokama referred to a letter from the U.S. Department of the Interior and stated that the U.S. Fish and Wildlife Service specifically requested this condition. Member Anderson added that the request was made on February 21, "and it's only because they were informed by people about what was going on in this area, not by the applicant." Member Jo Anne Johnson also commented, "I think that it's unfortunate that members of the public actually have to bring these kinds of situations to the attention of the very agencies that are supposed to be consulted to begin with."

Later in the discussion, Member Anderson noted, "[F]or those Members who feel conditions at this stage of the game would delay the final decision on this for two weeks to a month possibly[,]" "I hope the Members don't feel that these conditions should not be supported because Mr. Jencks wants a final decision tonight." The motion was defeated.

The second motion, again made on behalf of Chair Hokama, proposed adding a condition to require Honua'ula to complete an additional botanical survey of the project site to assess the potential impact on threatened and endangered plant species and supporting habitats. This motion was also made pursuant to a request by the U.S. Fish and Wildlife Service and was subsequently defeated.

The MCC then set aside the Change in Zoning bill and considered the Project District bill. After some discussion but without any new proposed amendments, the MCC voted to pass the Project District bill on second and final reading. The MCC then returned to the Change in Zoning bill, and after final concluding remarks, voted to pass the bill on second and final reading. Thus, both bills were passed without any changes being made between the first reading on February 14, 2008 and the second and final reading.

The meeting was finally adjourned at 12:49 a.m. on March 19, 2008.

The Mayor of Maui County signed the Wailea 670 bills into law on April 8, 2008.

#### B. Circuit court proceedings continued

Petitioners' Motion for Preliminary Injunction was heard on April 8, 14, 21, and 23, 2008. On April 23, 2008, the circuit court granted the motion, preliminarily enjoining the MCC "from engaging in any conduct that enforces, implements or otherwise treats as validly enacted" the Wailea 670 bills, "purporting to have passed first reading on February 14, 2008, purporting to have passed second reading on March 18, 2008, and purporting to have been signed into law on April 8, 2008, until further order of this Court."

On May 28, 2008, the circuit court granted Honua'ula's motion to intervene in the action.

On October 17, 2008, the circuit court held a hearing on the parties' cross-motions for summary judgment. The parties agreed that there were no disputes as to any material facts and agreed to submit the matter to the circuit court for a final decision on the merits based on a stipulated joint record. The cross-motions for summary judgment were

withdrawn and the court set November 17, 2008 for trial on the merits.

On November 17, the court granted judgment in favor of Respondents MCC, County of Maui, and Honua'ula and against Petitioners as to all claims and vacated its order granting Petitioners' Motion for Preliminary Injunction.

The circuit court entered its Findings of Fact, Conclusions of Law and Order on December 15, 2008. The circuit court concluded as a matter of law that the agenda for the October 18, 2007 LUC meeting "provided adequate notification of the item to be considered at the meeting."

The court denied Petitioners' contention that HRS § 92-7(d), which provides that "[i]tems of reasonably major importance not decided at a scheduled meeting shall be considered only at a meeting continued to a reasonable day and time," only allows for a single continuance of a meeting. The court relied on HRS § 1-17, which provides that words "in the singular or plural number signify both the singular and plural," to conclude that the term "day" in HRS § 92-7(d) means both "day" and "days."

The court also entered a conclusion of law that the Hawai'i Attorney General had "opined that recesses until a subsequent day are permitted if a board or commission cannot complete its business on the date that the meeting was publicly noticed ... provided that it announces at the publicly noticed meeting the date, place, and time of the continued meeting." [12] (quotation marks omitted).

Additionally, the circuit court entered a conclusion of law that the legislative history of the Sunshine Law revealed that the legislature "expressly rejected" a "provision that would have precluded items of major importance from being continued to a later date[.]" The court concluded there was no indication "that the legislature intended to place a limit on the number of times a meeting could be continued."

The court concluded, "The continuation of meetings which remain open to the public, following the public's opportunity to testify, does not conflict with the stated policies embodied in HRS §§ 92-1(2) and 92-1(3)[.]"

Considering the above, the court concluded that the "LUC was permitted by law to recess and reconvene the October 18, 2007 meeting on 12 successive days[.]" The court reasoned that HRS § 92-7(d) permitted the LUC to continue the decision-making portion of its October 18 meeting to "reasonable days and times" and that because the October 18 meeting was recessed and reconvened rather than adjourned, "it was not necessary for a new Agenda to be posted for each of the successive dates[.]"

In regard to Petitioners' argument that the recessed and reconvened meetings violated the public oral testimony requirement of the Sunshine Law, the circuit court concluded that oral testimony was not required to be taken once the LUC's decision-making deliberations began. The court noted that "Plain-

---

12. Relatedly, the court cited the October 14, 2008 declaration of David Raatz, a legislative attorney for the Office of Council Services, which was attached as an exhibit to the MCC and County of Maui's reply memorandum in support of their motion for summary judgment. Mr. Raatz stated in his declaration that in 2004, he contacted the Office of Information Practices (OIP) regarding a meeting before the Planning and Land Use Committee of the MCC, which he anticipated would "take several days to be completed." Prior to the agenda for the meeting being posted, Mr. Raatz contacted an OIP staff attorney and provided her with a copy of the draft agenda. The draft agenda specifically noted that it might be necessary to continue the meeting and provided the date, time and location of the anticipated continued meetings. The staff attorney responded by email, stating, "We think it suffices to reconvene the meeting, so long as the date, time and place of the continued meeting are also announced at the time the meeting is adjourned subject to the announced continuation." The attorney did not cite authority for this statement.

After eight continuations of the noticed meeting, Mr. Raatz again contacted the OIP to discuss the committee's ability to continue reconvening the meeting. He was advised that it was appropriate to continue meeting "provided that no individual recess lasts more than five days" and provided the "recesses did not appear to be based on any inappropriate purpose, such as to 'dodge' issues or decrease openness in government."

According to Mr. Raatz, it was his understanding that "the Office of Council Services has continued to follow the advice given by OIP[.]"

tiffs' interpretation of the Sunshine Law, which would require hearing public testimony at every reconvened meeting, could create logistical problems that might adversely impact the legislative process." Based on these conclusions, the circuit court held that the recessing and reconvening of the October 18, 2007 LUC meeting did not violate the Sunshine Law. The court applied the same reasoning to the recessing and reconvening of the February 8, 2008 MCC meeting, finding no violation of the Sunshine Law.

Regarding the MCC's memoranda on proposed amendments, the circuit court entered the following relevant findings of fact:

93. These memoranda were prepared as a matter of courtesy to the other Council members.

94. There is no evidence that there were any discussions or interactions of any sort, outside of the public meeting, by and between any Council members about the memoranda. . . .

95. None of the memoranda in question attempted to secure a Council Member's commitment to vote for the proposed amendments or reconsideration of conditions.

96. There is no evidence that any Council member attempted to have other Council members commit to vote for any proposed amendments or reconsideration of conditions.

(Citations omitted). Based on these findings, the circuit court concluded that Petitioners "failed to provide authority that the circulation of written proposed amendments under these circumstances violates the Sunshine Law." The court further concluded that Petitioners' reliance on *Right to Know Comm. v. City Council, City & Cnty. of Honolulu*, 117 Hawai'i 1, 175 P.3d 111 (App.2007) to demonstrate that the memoranda violated the Sunshine Law was misplaced, given that *Right to Know* involved a written resolution introduced jointly by a group of council members. The circuit court concluded that *Right to Know* did not prohibit an individual council member from "putting amendments in writing so that other members might more easily comprehend and consider" them.

The court also concluded that the memoranda "contain no request for a vote outside of the meeting."

The court concluded on this issue:

59. Hawai'i's Sunshine Law does not prohibit a single board member from memorializing in writing proposed floor amendments and other proposals that a board member intends to raise at a public board meeting, and providing that to other board members in advance of the public meeting. Whether this represents sound council policy or operating procedure is a question for the public and council to determine, provided the actions of the legislative body do not conflict with applicable law.

60. The Memoranda submitted by some Council members outlining amendments they intended to propose at the public hearing of the February 8, 2008 meeting <u>were not efforts by Council members to get other Council members to commit to vote for the Amendments to be proposed.</u>

61. The Memoranda . . . were not "discussions, communications or interactions" between Council members prohibited by HRS Chapter 92, Part I.

(Emphasis added).

The circuit court entered its Final Judgment in favor of Respondents and against Petitioners on January 22, 2009.

## II. APPEAL

### A.

On appeal to the ICA, Petitioners claimed that the circuit court "erred in concluding that the recessing and reconvening" of the October 18, 2007 and February 8, 2008 meetings "without providing additional notice and opportunity to testify" did not violate the Sunshine Law. Additionally, Petitioners claimed that the circuit court "erred in concluding that the circulation of memoranda among and between the entire membership

outside a duly noticed meeting" did not violate the Sunshine Law.[13]

In support of their first point, Petitioners argued that HRS § 92-7(d) permits a single continuance to a "reasonable day and time." Thus, Petitioners argued that the LUC and MCC's "marathon recessing" violated the Sunshine Law due to the failure to post new agendas and to accept public oral testimony at the meetings held beyond a single continuance. Relatedly, Petitioners argued that the "broad agenda item description" used by the LUC for its October 18, 2007 meeting "could not have possibly notified the public that [the LUC] would be considering twelve meetings worth of information" and making decisions regarding "twenty eight conditions" to the Wailea 670 bills.

In regard to the written communications, Petitioners argued that the Sunshine Law generally prohibits discussion regarding board business between board members outside of a properly noticed meeting, except as provided in HRS § 92-2.5. Petitioners argued that the written memoranda in this case did not fall within the list of permitted interactions provided for in HRS § 92-2.5 because the communications were distributed to the entire board, circumvented the Sunshine Law's open meetings requirement, and violated the prohibition against seeking or obtaining the position or vote of other board members outside of a duly noticed meeting.

### B.

The ICA affirmed the circuit court's January 22, 2009 Final Judgment. *Kanahele,* 2012 WL 2974909, at *4. Chief Judge Nakamura and Judge Fujise concurred in the majority opinion, while Judge Ginoza wrote a separate concurring opinion.

### 1.

The ICA majority rejected Petitioners' contention that the recessed meetings violated the Sunshine Law. The majority found that Petitioners' arguments that the recessed meetings violated the agenda and public oral testimony requirements of the Sunshine Law "rest on [the] contention that the recessed LUC and MCC meetings did not constitute proper continuations under the Sunshine Law." *Id.* at *2. The majority rejected this contention, finding that "HRS § 92-7(d) specifically allows for the continuation of meetings by a public 'board.' It states that agenda items of 'reasonably major importance not decided at a scheduled meeting shall be considered only at a meeting continued to a reasonable time and day'." *Id.* (footnote and citation omitted). The majority found that Petitioners' argument that the statute limits boards to a single continuance was not supported by legal authority, citing HRS § 1-17 as well as *Nobriga v. Raybestos–Manhattan, Inc.,* 67 Haw. 157, 163, 683 P.2d 389, 394 (1984), providing that "[t]he use of words in a statute signifying the singular is ... not conclusive." 2012 WL 2974909, at *2.

The majority found that even assuming *arguendo* that the language of HRS § 92-7(d) was ambiguous, the legislative history did not support Petitioners' contention that boards are limited to a single continuance, as the legislature had expressly rejected a proposal to prohibit continuing meetings for items of reasonably major importance. *Id.* Therefore, the majority concluded that the continued LUC and MCC meetings did not violate the Sunshine Law. *Id.*

As to Petitioners' contention that the written memoranda violated the Sunshine Law, the majority noted that Petitioners did not challenge the circuit court's finding "that there was no evidence of any discussion or interaction between the members, outside of a public meeting, regarding the memoranda." *Id.* The majority further found that "[n]one of the memoranda solicited a vote or a commitment on the subject matters in the memoranda," and each memoranda indicated that a copy was sent to the County Clerk's office as required by the Maui County Charter. *Id.* The ICA also found that "a review of the

---

13. Petitioners also argued that the circuit court erred in concluding that the MCC's reconsideration of amendments to the Wailea 670 bills did not violate the Sunshine Law. The ICA held that the circuit court did not err in this regard. *Ka-* *nahele v. Maui Cnty. Council,* No. 29649, 2012 WL 2974909, at *3–4 (Jun. 29, 2012)(SDO). Inasmuch as the Application does not raise this issue, it is not further addressed.

'minutes' of the February 8, 2008 meeting, reveals that the various authors of the memoranda referred, sometimes extensively, to the same in their deliberations at the public meeting. At a minimum, the motions proposed in the memoranda were repeated in the public hearing." *Id.*

The majority concluded that the Sunshine Law's underlying policy, that "provisions requiring open meetings shall be liberally construed and provisions for exceptions to open meetings shall be strictly construed," did not prohibit the challenged distribution of memoranda. *Id.* at *3. According to the majority, HRS § 92–2.5 "allows two board members to privately discuss official board matters in two-way, face-to-face communications, as long as the members do not seek voting commitments." *Id.* (footnote omitted). The majority reasoned, "As this type of two-way communication is permitted under the statute, one-way communication that also does not involve securing commitments or votes of other members and is treated and disclosed to the public as was done here appears likewise to be within the scope of permissible communications." *Id.* (emphases added).

Relatedly, the majority found no support for Petitioners' interpretation of HRS § 92–2.5 to mean that "communications, interactions, discussions, investigations and presentations not described in section 2.5 are meetings for purposes of the statute." *Id.* (emphasis in original). According to the majority, Petitioners did not argue that the memoranda were distributed for the purpose of evading the Sunshine Law. *Id.* Petitioners also did not allege that they were prevented from viewing or commenting on the memoranda. *Id.* The majority concluded that based on the record, it could not say the circuit court erred in holding that the memoranda were not prohibited under the Sunshine Law. *Id.* The majority further held, "[W]e are convinced, based on a review of this record, that the distribution of these memoranda did not violate the purpose or the spirit of the Sunshine Law." *Id.*

2.

The concurrence disagreed with the majority's conclusion that the written memoranda were permitted by the Sunshine Law.[14] *Kanahele*, 2012 WL 2974909, at *4 (Ginoza, J., concurring). The concurrence concluded that based on a plain reading of the Sunshine Law and "particularly given the broad declaration of policy and intent articulated in HRS § 92–1," the memoranda distributed among the MCC members "outside of the public meetings do not comport with Hawaii's Sunshine Law because the memoranda were part of the council's deliberation toward their decision on first reading of the Wailea 670 Bills." *Id.* at *5.

The concurrence found that a review of the fourteen memoranda prepared and distributed among the MCC members in relation to the meetings held on February 8, 11 and 14, 2008, "establishes that each provided substantive explanations or justifications in support of the proposed amendments or proposed reconsideration, sometimes referring to testimony that had been received in prior meetings as a reason for the proposals contained in the memorandum." *Id.* Although the memoranda were "treated in a public fashion in that they were copied to the County Clerk and openly referred to in the council meetings," there was also "no evidence that the memoranda were disseminated to the public or made available to the public at the meetings." *Id.* Thus, the substantive memoranda were part of the MCC's deliberations toward their decision on first reading of the Wailea 670 bills and did not comport with the Sunshine Law. *Id.*

The concurrence also disagreed with the majority on the interpretation of the "permitted interactions" provision of HRS § 92–2.5. *Id.* at *5–6. The concurrence explained that pursuant to HRS § 92–3, all board meetings must be open to the public. *Id.* at *5. Although HRS § 92–2 only defines a "meeting" as the "convening of a board" for certain purposes, when the legislature adopted HRS § 92–2.5, entitled "Permitted interactions of members," the legislature explained that the

---

**14.** The concurrence agreed with the majority on the issue of whether the recessed meetings violat-

ed the Sunshine Law.

purpose of the act was to "specify those instances and occasions in which members of a board may discuss certain board matters." *Id.* at *5–6 (quoting 1996 Haw. Sess. Laws Act 267, § 1 at 628). Therefore, the concurrence found, "It thus appears that the legislature has specified the permitted interactions of board members 'outside the realm of a public meeting.'" *Id.* at *6.

Even assuming that one-way memoranda constituted permitted interactions, the concurrence noted that "most of the permitted interactions under HRS § 92–2.5 preclude interaction between a quorum of the board." *Id.* In this case, the memoranda were distributed to all MCC members outside of a public meeting. *Id.* In addition, the concurrence emphasized that HRS § 92–5(b) provides that no *"permitted interaction . . . shall be* used to circumvent the spirit or requirements of this part to make a decision or *to deliberate toward a decision* upon a matter over which the board has supervision, control, jurisdiction, or advisory power." *Id.* (emphasis in original) (quotation marks omitted).

After concluding that the memoranda violated the Sunshine Law, the concurrence analyzed whether the violation should result in voiding the MCC's actions pursuant to HRS § 92–11, which provides that "[a]ny final action taken in violation of sections 92–3 and 92–7 may be voidable upon proof of violation." The concurrence concluded that the challenged memoranda should not result in voiding the MCC's actions, reasoning first that the challenged memoranda did not relate to a "final action." *Id.* at *6. Although the Sunshine Law does not define the term "final action," the concurrence found that "its plain meaning . . . appears to mean the final act required to carry out the board's authority on a matter." *Id.* The concurrence explained that because "the challenged memoranda were related to the council's first reading of the Wailea 670 Bills, [and] there was a subsequent second reading and passage of the bills on March 18, 2008," the memoranda did not relate to a "final action" taken in violation of HRS § 92–3. *Id.*

Second, the concurrence found that even assuming that a "final action" was taken in relation to the challenged memoranda, HRS § 92–11 provides that the board action "may" be voidable. *Id.* The concurrence reasoned that in this case, "although the memoranda did not technically comply with [the Sunshine Law], they were provided to the County Clerk, . . . and moreover, the memoranda were openly discussed at the council meetings. Additionally, [Petitioners] have made no argument that they were affected in any way or prejudiced by the memoranda that they challenge." *Id.* at *7. Therefore, the concurrence concluded that "although the use of the challenged memoranda was a technical violation of [the Sunshine Law], voiding the actions taken by the [MCC] is not warranted under HRS § 92–11." *Id.*

### III. APPLICATION FOR WRIT OF CERTIORARI

In their Application to this court, Petitioners argue that the ICA erred in interpreting the Sunshine Law to permit a board or commission "to conduct a series of meetings to deliberate on a matter within its jurisdiction without having to comply with the notice and public oral testimony requirements" of the Sunshine Law. Additionally, Petitioners maintain that the ICA erred in interpreting the Sunshine Law to permit board members "to circulate extensive written memoranda presenting and advocating for proposed action to the entire membership of the board or commission outside of a public meeting."

### IV. DISCUSSION

#### A.

At issue in resolving Petitioners' first claim is whether the ICA erred in holding that the recessing and reconvening of the October 18, 2007 LUC meeting and the February 8, 2008 MCC meeting comported with the notice and public oral testimony requirements of the Sunshine Law.

As the ICA found, this claim rests on Petitioners' contention that HRS § 92–7(d) limits boards to a single continuance of a noticed meeting. Based on this premise, Petitioners have argued that for any meetings held by the LUC or MCC beyond a single continuance, the board was required to post a

new agenda and to accept public oral testimony.

### 1.

■■ "The interpretation of a statute is a question of law reviewable *de novo*." *Franks v. City & Cnty. of Honolulu*, 74 Haw. 328, 334, 843 P.2d 668, 671 (1993). We apply the following standard in interpreting statutes:

> When construing a statute, <u>our foremost obligation is to ascertain and give effect to the intention of the legislature which is to be obtained primarily from the language contained in the statute itself.</u> We must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose. <u>When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute an ambiguity exists.</u> If the statutory language is ambiguous or doubt exists as to its meaning, courts may take legislative history into consideration in construing a statute.

*Id.* at 334–35, 843 P.2d at 671–72 (quotation marks and citations omitted) (emphases added). "If we determine, based on the foregoing rules of statutory construction, that the legislature has unambiguously spoken on the matter in question, then our inquiry ends." *In re Water Use Permit Applications*, 94 Hawai'i 97, 144, 9 P.3d 409, 456 (2000).

■■ However, when an ambiguity exists, we consider interpretations of the statute made by the administrative agency responsible for enforcing the statute and "follow the same, unless the construction is palpably erroneous":

> When the legislative intent is less than clear, however, this court will observe the well established rule of statutory construction that, where an administrative agency is charged with the responsibility of carrying out the mandate of a statute which contains words of broad and indefinite meaning, <u>courts accord persuasive weight to administrative construction and follow the same, unless the construction is palpably erroneous.</u>

*Id.* (quotation marks omitted) (emphases added). *See Vail v. Emps.' Ret. Sys. of the State of Haw.*, 75 Haw. 42, 66, 856 P.2d 1227, 1240 (1993). "An agency's interpretation of a statute is palpably erroneous when it is inconsistent with the legislative intent underlying the statute." *Gillan v. Gov't Emps. Ins. Co.*, 119 Hawai'i 109, 119, 194 P.3d 1071, 1081 (2008).

■■ Thus, judicial deference to an agency's interpretation of ambiguous statutory language "is constrained by our obligation to honor the clear meaning of a statute, as revealed by its language, purpose, and history." *Morgan v. Planning Dep't, Cnty. of Kaua'i*, 104 Hawai'i 173, 180, 86 P.3d 982, 989 (2004) (quotation marks omitted).

### 2.

Accordingly, we first look to the language of the Sunshine Law to determine whether a board is limited to a single continuance under HRS § 92–7(d).

HRS § 92–3 (1993) contains among its provisions the public testimony requirement of the Sunshine Law. § 92–3 mandates that "[e]very meeting of all boards shall be open to the public and all persons shall be permitted to attend any meeting," and that "boards shall also afford all interested persons an opportunity to present oral testimony on any agenda item."[15] The legislature gave boards a certain amount of discretion over the oral testimony requirement, stating that "boards may provide for reasonable administration of oral testimony by rule." *Id.*

HRS § 92–7 constitutes the notice provision of the Sunshine Law. Subsection (a) requires that "[t]he board shall give written public notice of any regular, special, or rescheduled meeting.... The notice shall include an agenda which lists all of the items to be considered at the forthcoming meeting, [and] the date, time, and place of the meet-

---

15. A "board" is defined as "any agency, board, commission, authority, or committee of the State or its political subdivisions which is created by constitution, statute, rule, or executive order, to have supervision, control, jurisdiction or advisory power over specific matters and which is required to conduct meetings and to take official actions." HRS § 92–2 (1993). There is no dispute that the MCC and LUC fall within this statutory definition of a "board."

ing[.]" HRS § 92–7(a) (Supp.2008).[16] Subsection (b) requires the board to file the notice in the appropriate office "at least six calendar days before the meeting," and provides that "[t]he notice shall also be posted at the site of the meeting whenever feasible." HRS § 92–7(b) (Supp.2008).

HRS § 92–7(d) (Supp.2008) provides that "[i]tems of reasonably major importance not decided at a scheduled meeting shall be considered only at a meeting continued to a reasonable day and time." However, subsection (d) does not specify how it relates to the notice provisions under subsections (a) and (b); that is, the statute does not state whether a meeting continued under subsection (d) triggers the requirement to post an agenda within six days of the meeting or requires the board to accept public oral testimony at the continued meeting. HRS § 92–7(d) does not specify any particular process for the board to follow in continuing a meeting to a reasonable day and time.

HRS § 92–7(d) also does not specify whether boards are limited to a single continuance, providing only that meetings may be "continued to a reasonable day and time."

Although the circuit court and ICA relied on the general rule stated in HRS § 1–17 (that words in the "singular or plural number signify both the singular and plural number") to find that the term "day" in HRS § 92–7(d) should be construed to permit multiple continuances of meetings, HRS § 1–17 is not dispositive. "This court has interpreted statutes using the statutory presumption in HRS § 1–17 only after reviewing the legislative history and context in which a statute was passed to determine whether the legislature intended to signify both the singular and plural forms of a word." *AlohaCare v. Ito,* 126 Hawai'i 326, 347, 271 P.3d 621, 642 (2012).

Thus, we next consider the administrative construction and legislative history of the Sunshine Law.

■■■ The OIP is the agency charged with the responsibility of administering the Sunshine Law.[17] HRS § 92–1.5 (2012). As such, its opinions are entitled to deference so long as they are consistent with the legislative intent of the statute and are not palpably erroneous. *See* HRS § 92–12(d) (2012) ("Opinions and rulings of the [OIP] shall be

---

16. In its current form, HRS § 92–7 (2012) provides:

> (a) <u>The board shall give written public notice of any regular, special, or rescheduled meeting, or any executive meeting when anticipated in advance.</u> The notice shall include an agenda which lists all of the items to be considered at the forthcoming meeting, the date, time, and place of the meeting, and in the case of an executive meeting the purpose shall be stated. The means specified by this section shall be the only means required for giving notice under this part notwithstanding any law to the contrary.
> (b) The board shall file the notice in the office of the lieutenant governor or the appropriate county clerk's office, and in the board's office for public inspection, <u>at least six calendar days before the meeting.</u> The notice shall also be posted at the site of the meeting whenever feasible.
> (c) If the written public notice is filed in the office of the lieutenant governor or the appropriate county clerk's office less than six calendar days before the meeting, the lieutenant governor or the appropriate county clerk shall immediately notify the chairperson of the board, or the director of the department within which the board is established or placed, of the tardy filing of the meeting notice. The meeting

> shall be canceled as a matter of law, the chairperson or the director shall ensure that a notice canceling the meeting is posted at the place of the meeting, and no meeting shall be held.
> (d) No board shall change the agenda, once filed, by adding items thereto without a two-thirds recorded vote of all members to which the board is entitled; provided that no item shall be added to the agenda if it is of reasonably major importance and action thereon by the board will affect a significant number of persons. <u>Items of reasonably major importance not decided at a scheduled meeting shall be considered only at a meeting continued to a reasonable day and time.</u>
> (e) The board shall maintain a list of names and addresses of persons who request notification of meetings and shall mail a copy of the notice to such persons at their last recorded address no later than the time the agenda is filed under subsection (b).
> (Emphases added).

17. HRS § 92–1.5 was adopted in 1998. 1998 Haw. Sess. Laws Act 137, § 1 at 514. Prior to its adoption, the Sunshine Law was enforced by the attorney general but there was no single government agency "responsible for overseeing compliance of open meeting requirements[.]" *Id.*

admissible in an action brought under this part and shall be considered as precedent unless found to be palpably erroneous."); *Gillan v. Gov't Emps. Ins. Co.*, 119 Hawai'i 109, 119, 194 P.3d 1071, 1081 (2008) (agency's interpretation is palpably erroneous when inconsistent with underlying legislative intent); *Right to Know Comm. v. City Council, City & Cnty. of Honolulu*, 117 Hawai'i 1, 13, 175 P.3d 111, 123 (App.2007).

In a 2001 opinion primarily interpreting the public testimony requirement of HRS § 92–3, the OIP stated that a board "may decide on proposed rule revisions after the public hearing without the duty to accept further public testimony during its decision-making simply by continuing the decision-making portion of the meeting to a reasonable day and time as provided by section 92–7(d)[.]" OIP Op. Ltr. No. 01–06, 2001 WL 1876821, at *5 (Dec. 31, 2001). The OIP explained, "[a]s a practical matter, for a board to perform its designated role by deliberating toward decisions, it must be able to conclude the public testimony portion of an agenda item once it has afforded all interested persons an opportunity to present oral testimony[.]" *Id.* at *6 (quotation marks and brackets omitted).

Although the specific procedure for continuing a meeting under HRS § 92–7(d) was not one of the issues presented to the OIP,[18] the OIP recommended that in "continu[ing] the decisionmaking portion of the hearing/meeting," a "board should":

(1) At the meeting that includes the public hearing, agree on and announce the continuation of the meeting to an announced and reasonable date, time, and place;

(2) Adjourn the meeting subject to the announced continuation; and

(3) Reconvene the meeting for decision-making on the announced date and at the announced time and place.

*Id.* at *8. The OIP found in that case that the city Liquor Commission held separate meetings with separate notices and agendas, rather than a single noticed meeting that was continued under HRS § 92–7(d). OIP Op. Ltr. No. 01–06, 2001 WL 1876821, at *5. Thus, the Liquor Commission violated the Sunshine Law by refusing to accept public testimony at the second meeting. *Id.*

 The OIP explained, however, that the board's ability to continue its consideration of agenda items is subject to the following limitations:

First, to take up any new matter of reasonably major importance and affecting a significant number of persons, a board would need to publish a new agenda and thus call a new meeting.[19] Second, a board may only continue consideration of an agenda item without calling a new meeting when that continuation is reasonable, and a continuation that impaired to any significant degree the public's ability to testify on an ongoing issue would likely not be reasonable.

*Id.* at *5 n. 6 (emphasis added) (citation omitted). The OIP did not state or suggest that a board is limited to a single continuance when reconvening a meeting under HRS § 92–7(d).

---

**18.** The issues presented were: 1) whether the city Liquor Commission properly noticed its decision-making on proposed rule revisions, where the posted agenda failed to notify the public that the Liquor Commission would be deliberating or deciding on certain proposed rule revisions previously considered; 2) whether HRS § 91–3 (Supp.2000) and HRS § 92–3 conflict; and 3) whether the Liquor Commission violated the Sunshine Law by prohibiting public testimony on an agenda item, where the Liquor Commission held separate meetings with separate notices and agendas. OIP Op. Ltr. No. 01–06, 2001 WL 1876821 at *1.

**19.** "Determination of whether an item 'is of reasonably major importance' and when board action thereon will 'affect a significant number of persons' is fact-specific and must be made on a case-by-case basis." OIP Op. Ltr. No. 06–05, 2006 WL 2103475, at *2 (Jul. 19, 2006). "As a general rule, a proposed bill, being a legislative act through which the Council seeks to enact county law, must be viewed as an item of 'reasonably major importance' that affects a 'significant number of persons.' " OIP Op. Ltr. No. 07–02, 2007 WL 550326, at *4 (Feb. 2, 2007). *See also* Jon M. Van Dyke, *Hawaii's Sunshine Law Compliance Criteria*, 26 U. Haw. L. Rev. 21, 27 (2003) ("A matter is of reasonably major importance if it is of interest to any sector of the community, and an agenda item would affect a significant number of persons if it would concern more than a handful of individuals.").

In addition, the OIP specifically declined to decide what would constitute a "reasonable continuation date for the original meeting," as the Liquor Commission had not in fact reconvened the original meeting. *Id.* at *5 n. 5. The OIP did not indicate what would be "reasonable" in the context of a series of continued meetings, or suggest that a meeting continued pursuant to HRS § 92–7(d) must be reconvened within five days.

 The OIP's interpretation of the Sunshine Law, insofar as it permits more than a single continuance without requiring a new agenda and without requiring additional public testimony to be accepted at every continued meeting, is supported by the legislative history of the statute.

The Sunshine Law provision for continuing meetings to a reasonable date and time was adopted by the legislature in 1985. 1985 Haw. Sess. Laws Act 278, § 4 at 592–93. The Senate's original bill proposed that "[i]tems of reasonably major importance shall not be considered at a meeting continued to a later date." S.B. No. 1413, 13th Leg., Reg. Sess. (1985). The original bill also proposed amending HRS § 92–3 to require boards to "afford all interested persons an opportunity to submit data, views, or arguments, orally or in writing, on any agenda item." *Id.*

The House amended the bill by deleting the proposed amendment to prohibit items of reasonably major importance from being considered at a continued meeting. H. Stand. Comm. Rep. No. 889, in 1985 House Journal, at 1425. The House Judiciary Committee acknowledged that "there have been problems where important issues have been continued and advance notice of subsequent meetings has not been sufficient," but reasoned that the deletion was appropriate because it was "unreasonable" to completely deny boards the ability to continue meetings:

> Your Committee further believes that it is unreasonable to require that items of "reasonably major importance" must be acted upon at a meeting. There are situations that arise which require a meeting to be continued such as when additional information is required, many people wish to testify on an agenda item, a board lacks a

majority vote on a decision and it would be better to recess and consider the matter at a later date, or an unresolved item could delay ending with a meeting.

*Id.*

With respect to the oral testimony requirement, the House amended the bill to provide that boards must afford all interested persons an opportunity to submit testimony in writing, "provided, further, at the discretion of the board, interested persons may be allowed to present <u>oral</u> testimony on any agenda item." S.B. No. 1413, H.D. 1, 13th Leg., Reg. Sess. (1985) (emphasis added). The House Judiciary Committee explained that it "wanted to ensure that interested persons be allowed to present their views but it felt that there had to be some balance between access to the boards and the boards [sic] ability to conduct business." H. Stand. Comm. Rep. No. 889, in 1985 House Journal, at 1424.

The conference committee then amended the bill to adopt the current language of § 92–7(d), requiring "a board which is unable to complete its agenda to continue consideration of items of reasonably major importance to a reasonable day and time." Conf. Comm. Rep. No. 36, in 1985 Senate Journal, at 867. The conference committee also adopted the current language of § 92–3, stating that "boards may provide for reasonable administration of oral testimony by rule." S.B. No. 1413, C.D. 1, 13th Leg., Reg. Sess. (1985); Conf. Comm. Rep. No. 36, in 1985 Senate Journal, at 867.

Thus, the legislative history of the Sunshine Law reflects a concern for balancing public access to board meetings with the board's continued ability to effectively conduct its business. This concern is exemplified in the public testimony provision, which expressly grants boards discretion to reasonably administer the oral testimony requirement. The same concern also appears to support the continued meetings provision, as the House report considered that it was unreasonable to require boards to decide on matters of reasonably major importance at a single meeting. There is no suggestion that the legislature intended for boards to be limited to a single continuance.

Accordingly, based on the OIP's construction of the Sunshine Law as well as the legislative history of the statute, we conclude that the LUC and MCC did not violate the Sunshine Law by continuing and reconvening the October 18, 2007 meeting and February 8, 2008 meeting beyond a single continuance. However, while the legislature did not expressly limit the number of continuances permissible under HRS § 92–7(d), the legislative history and text of the Sunshine Law demonstrates that boards are constrained at all times by the spirit and purpose of the Sunshine Law, as stated in HRS § 92–1.

■ A board may consider various procedural devices in the interest of ensuring that meetings are continued in a manner that complies with the spirit and purpose of the law, particularly when serially recessing meetings on an issue of great significance to the community.[20] For example, if a board is cognizant that a single meeting will be insufficient for the consideration of an agenda item and anticipates continuances, a board may include the dates of continuances in the agenda posted pursuant to HRS § 92–7(a). The record in this case indicates that MCC committees have previously included anticipated dates and times of continuances on its posted meeting agenda. *See supra* note 12. A board is also not required to serially recess meetings on an agenda item of reasonably major importance. Rather, a board may decide to hold separate meetings, with separate agendas, on different aspects of the same bill. This would be particularly beneficial for members of the public who are only interested in certain facets of the project that may be divisible, such as the impact of the project on the environment, housing, or traffic. In this manner, the public would be able to better understand what the board intends to consider at each meeting. *Cf.* OIP Op. Ltr. No. 07–02, 2007 WL 550326, at *2 (Feb. 2, 2007) (HRS § 92–7(a) requires boards to sufficiently describe agenda items "to allow a member of the public to understand what the board intends to consider at the meeting and to decide whether to attend and to participate through oral or written testimony"). Such a practice would be consistent with the purpose of the notice and agenda provisions of the Sunshine Law, "to give the public the opportunity to exercise its right to know and to scrutinize and participate in the formation and conduct of public policy." OIP Op. Ltr. No. 06–05, 2006 WL 2103475, at *4 (Jul. 19, 2006).

A board may also consider permitting periodic oral testimony by members of the public, as issues develop during the deliberation process.[21] In this case, the LUC accepted public testimony on the Wailea 670 bills at the October 18, 2007 meeting. Each person was given four minutes to speak. The LUC then proceeded to conduct twelve continued meetings, encompassing "over 45 hours of deliberation." No further oral public testimony was received by the LUC.

Periodically re-opening the public oral testimony portion of the meeting in such cases, where a meeting is serially recessed and the board engages in extensive deliberation on the matter, would be consistent with the purpose of the public testimony requirement, to "ensure that interested persons be allowed to present their views[.]" H. Stand. Comm. Rep. No. 889, in 1985 House Journal, at 1424.

Periodic testimony may be especially appropriate in situations where a controversial or significant issue that was not anticipated develops during the board's discussions and decision-making. Relatedly, a board could consider accepting periodic oral testimony from members of the public in the interest of fairness and accuracy of information, where the board has solicited or received comments from other interested parties during the deliberation process.[22]

---

**20.** The board may only continue meetings under HRS § 92–7(d) with respect to "[i]tems of reasonably major importance." *See supra* note 19.

**21.** A board has discretion to reasonably administer oral testimony, by subject matter or time constraints, as appropriate given the circumstances. *See* HRS § 92–3.

**22.** At ten out of the twelve continued LUC meetings, Honua'ula's representative responded to questions posed by the board members regarding matters under discussion.

Such procedural measures maximize the public's ability to observe and participate in the government processes. Thus, a board should consider implementing such devices to ensure that the "formation and conduct of public policy" is "conducted as openly as possible," HRS § 92–1, particularly when the board has before it a matter that requires multiple continuances and is of great significance to the community. In any event, a board is at all times constrained to give effect to the spirit and purpose of the Sunshine Law.

### 3.

█ In this case, Petitioners argued that the LUC and MCC were required to post a new agenda and to accept oral testimony at each meeting beyond the first continuance. While we hold that this is not a requirement of the Sunshine Law, nevertheless the spirit and purpose of the Sunshine Law, as expressed in HRS § 92–1, requires that meetings should be continued in a manner that ensures open government and public participation.[23] While the legislature authorized meetings to be continued under HRS § 92–7(d), the legislature provided no specific no-

tice procedure for such continuations. Moreover, in 2012, the legislature amended HRS § 92–7(a) to add the following language: "The means specified by this section shall be the only means required for giving notice under this part notwithstanding any law to the contrary."[24] 2012 Haw. Sess. Laws Act 177, § 2 at 177; see supra note 16. Neither a written public notice nor an oral announcement is specifically required for continued meetings under HRS § 92–7(d).

HRS § 92–1 (2012), entitled "Declaration of policy and intent," declares that "it is the policy of this State that the formation and conduct of public policy—the discussions, deliberations, decisions, and action of governmental agencies—shall be conducted as openly as possible." (Emphases added). In order to implement this policy, the legislature declared, "(1) It is the intent of this part to protect the people's right to know; (2) The provisions requiring open meetings shall be liberally construed; and (3) The provisions providing for exceptions to the open meeting requirements shall be strictly construed against closed meetings." HRS § 92–1.

**23.** We note that the record indicates that the MCC adheres to a practice of reconvening continued meetings within five days. HRS § 92–7(d) (2012), see supra note 16, does not require a continued meeting to be held within five days of the prior meeting. Nothing in the text or the legislative history of the Sunshine Law indicates that the legislature intended to place such a restriction on the continuation of meetings. Although the record includes a declaration by an attorney for the Office of Council Services that he was advised by an OIP staff attorney that no individual recess should last for more than five days, no basis was provided for such a requirement and the OIP has not made such a statement in a formal opinion.

Additionally, requiring a board to reconvene within five days may have an adverse effect on public participation, by making it more difficult for the public to attend a meeting on short notice, or by limiting board members to inconvenient meeting times. In this case, the LUC members scheduled meetings to meet the perceived five day limit, even though there were days beyond the limit that members preferred to meet on. Compelling board members to meet within a certain time frame also does not prevent members from superficially meeting for a few minutes in order to simply extend the continuation for another five days.

**24.** The original bill would have required written public notice for emergency meetings when anticipated in advance. S.B. No. 2859, 26th Leg., Reg. Sess. (2012). The original bill also would have required boards, in addition to filing the notice in the board's office and at the site of the meeting, to post the notice on a designated electronic calendar maintained on a state or county website. Id. These additional notice requirements for emergency meetings and for electronic filing were subsequently removed. S. Stand. Comm. Rep. No. 2458, S.B. No. 2859, S.D. 1, 26th Leg., Reg. Sess. (2012) (removing electronic notice requirement); H. Stand. Comm. Rep. No. 1151–12, in 2012 House Journal, at 1378–79 (deleting written notice requirement for emergency meetings).

The language providing that "[t]he means specified by this section shall be the only means required for giving notice under this part" was left intact from the original bill. The House Committee on Finance stated that the bill as amended "[c]larifies that the current statutory written public notice requirement of any regular, special, or rescheduled meeting, or any executive meeting when anticipated in advance is the only means required for providing such notice." H. Stand. Comm. Rep. No. 1589–12, in 2012 House Journal, at 1528.

▆▆▆▆ Importantly, HRS § 92–1 explains that "[i]n a democracy, the people are vested with the ultimate decision-making power. Governmental agencies exist to aid the people in the formation and conduct of public policy." The statute continues, "Opening up the governmental processes to public scrutiny and participation is the <u>only viable and reasonable method</u> of protecting the public's interest" in the formation and conduct of public policy. (Emphasis added). This makes it clear that the legislature intended for the Sunshine Law to prescribe a certain process for "the formation and conduct of public policy" that would reliably protect the public's right to participate in their government. The Sunshine Law is essentially a procedural guarantee to protect the public's interest in government decision-making.

▆▆▆ The policies expressed in HRS § 92–1 are a direct result of the legislature's belief in the dangers of a secret government and its attempt to protect the public from such a government. When the Sunshine Law was adopted in 1975, the legislature envisioned that the law would be a "stringent open meeting bill that meets the demands and the concerns of the general public regarding the decision-making process." 1975 House Journal, at 778 (statement of Rep. Roehrig). The hope was that "[g]overnment decision-making before the public will mean that everyone will have equal opportunity to become involved in the process." *Id.* (statement of Rep. Ajifu). As Representative Poepoe explained,

> [O]n many occasions in the past, government decision-making has always been a closed-door process, in which a relative small number of people have been able to exert inordinate influence on issues affecting all of Hawai'i's people.
> We cannot and must not allow this to go on.
> Democracy cannot survive for very long in darkness. <u>There is no room for secrecy in our form of government. The people have the right to know what their public servants are doing behind the closed doors.</u>
> . . . .
> [The Sunshine Law] will accomplish several of our goals in the area of government

reform. It requires that government meetings with few exceptions be open to the public, that adequate notice be given, and that the minutes be made readily available to the public.

*Id.* at 779 (emphasis added).

Accordingly, when the legislature adopted the language of HRS § 92–7(d), there was an underlying concern that permitting meetings to be continued would discourage the public from participating in the decision-making process. As noted, the House Judiciary Committee, in deleting the original language that would have prohibited the continuation of meetings, acknowledged testimony that "there have been problems when important issues have been continued and advance notice of subsequent meetings has not been sufficient." H. Stand. Comm. Rep. No. 889, in 1985 House Journal, at 1425. The deletion of the original language was criticized by some legislators on this basis. Representative Tam explained,

> Sometimes, members of boards and commissions fail to make accommodations for the working public. It is already difficult enough for a working person with a family to sacrifice the time and effort required to prepare a testimony, gather support, and attend a public meeting. <u>When meetings are continued to a later date, people are discouraged from attempting to participate in the process of government decision making.</u> The original bill would have prevented a situation in which a board continues a meeting to a later date in an attempt to avoid the presentation of public sentiment.

1985 House Journal, at 562 (emphasis added).

Representative Ikeda also criticized the House's deletion, stating, "[i]nstead of attempting to work out any problems it had with the particular phraseology used, the draft simply deleted the entire clause. In addition, nothing has been included to require that adequate public notice be given on any deferred matter or decision." *Id.* at 562–63.

▆▆▆ The legislature's concern, then, with respect to the Sunshine Law has always been that the public should have a realistic, actual

opportunity to participate in the board's processes rather than a theoretical "right" to participate in name only. It is manifest that if no notice was required for reconvened meetings, members of the public would effectively be shut out of the entire deliberation process, which would certainly violate the Sunshine Law's requirement that "deliberations" be "conducted as openly as possible."

HRS § 92–1. Requiring no notice for reconvened meetings would also appear to be at odds with the placement of the continuation provision within HRS § 92–7, which is entitled "Notice."

■ Legislatures and courts in other jurisdictions have employed various approaches to keep the public notified of continued meetings.[25] The LUC and MCC in this case, based

**25.** Some states have rejected the practice of continuing meetings without providing the full notice required for all other meetings subject to the open meetings law or do not differentiate continued or recessed meetings from other meetings. *See e.g.,* Fla. Stat. § 286.011(1) (West, Westlaw through 2012 Act 25) ("All meetings of any board or commission of any state agency or authority or of any agency or authority of any county ... are declared to be public meetings open to the public at all times.... The board or commission must provide reasonable notice of all such meetings."); N.J. Stat. Ann. § 10:4–8(d) (West, Westlaw through 1981 Act 176) ("'Adequate notice' means written advance notice of at least 48 hours, giving the time, date, location and, to the extent known, the agenda of any regular, special or rescheduled meting[.]"), § 10:4–9(a) ("no public body shall hold a meeting unless adequate notice thereof has been provided to the public"); *Dunn v. Mayor & Council & Clerk of the Borough of Laurel Springs,* 163 N.J.Super. 32, 394 A.2d 145, 146 (N.J.Super.Ct.App.Div.1978) (per curiam) ("We reject defendants' contention that a meeting 'recessed' from one day to the next day may be resumed on the following day without any new notice to the public. [...] Where no emergency exists, adequate notice in conformity with the statute ... must be given."); R.I. Gen. Laws § 42–46–6(b) (West, Westlaw through 2011 Act 151) ("Public bodies shall give supplemental written public notice of any meeting within a minimum of forty-eight (48) hours before the date.").

The Florida Attorney General has explained that "[t]o allow a meeting noticed for a specific date, time and location to be continued to a future date, time and location without further proper notice, would effectively open the future meeting only to those individuals who attended the initial meeting." Fla. Opp. Att'y Gen. 90–56, 1990 WL 509075, at *2 (Jul. 24, 1990). "This leaves to chance that interested members of the public who happened not to be in attendance at the properly noticed meeting would receive notice of the future meeting." *Id.*

Other states require written notice of a continued, adjourned or reconvened meeting to be posted, generally at the place where the original meeting was held, within a specified time frame following the original meeting. *See* Cal. Gov't Code § 54955.1 (West, Westlaw through 1965 Act 469) ("Any hearing being held, or noticed or ordered to be held, by a legislative body of a local agency ... may by order or notice of continuance be continued or recontinued" in the manner set forth in § 54955), § 54955 (West, Westlaw through 1959 Act 647) (requiring written notice to be "conspicuously posted on or near the door of the place where the ... meeting was held within 24 hours"); Cal. Gov't Code § 11128.5 (West, Westlaw through 1997 Act 949), § 11129 (West, Westlaw through 1997 Act 949) (same rule for state bodies); Conn. Gen. Stat. § 1–229 (West, Westlaw through 1975 Act 342), § 1–228 (West, Westlaw through 1975 Act 342) (notice of continued meeting must be conspicuously posted on or near the door of the place where the meeting was held, within twenty-four hours); Wash. Rev.Code § 42.30.090 (West, Westlaw through 2012 Act 117), § 42.30.100 (West, Westlaw through 1971 Act 250) (same); Miss.Code Ann. § 25–41–13(1) (West, Westlaw through 2013 Act 388) ("notice of the place, date, hour and subject matter of any recess meeting ... shall be posted within one (1) hour after such meeting is called in a prominent place available to examination and inspection by the general public in the building in which the public body normally meets"); N.M. Stat. Ann. § 10–15–1(E) (West, Westlaw through 2013 Act 42) (Public body may recess and reconvene meeting if, prior to recessing it "specifies the date, time and place for continuation ... and, immediately following the recessed meeting, posts notice of the ... reconvened meeting on or near the door of the place where the original meeting was held and in at least one other location appropriate to provide public notice[.]"); 65 Pa. Cons. Stat. § 703 (West, Westlaw through 2004 Act 88) (for a recessed or reconvened meeting, notice must be posted "prominently at the principal office of the agency holding the meeting or at the public building in which the meeting is to be held"); Wyo. Stat. Ann. § 16–4–404(c) (West, Westlaw through 2012 Act 75) ("The governing body of an agency may recess any regular, special, or recessed regular or special meeting to a place and ... time specified in an order of recess. A copy of the order of recess shall be conspicuously posted on or near the door of the place where the meeting or recessed meeting was held.").

On the other hand, other states do not require additional notice for a recessed meeting, *see Town of Nottingham v. Harvey,* 120 N.H. 889, 424 A.2d 1125, 1129 (1980) (holding that posting

on the advice of the OIP, notified the public of the date, time and place of the continued meetings through an oral announcement made at the time of adjournment.[26] An oral announcement may be less accessible than a written notice, require members of the public to remain to the end of the meeting to hear the oral announcement, and pose challenges for those who are unable to attend the meeting or remain to its conclusion.[27] Moreover, the significance of notice to the public is heightened in a situation where, as was the case here, there are multiple continuances.[28] Thus while a continued meeting does not require a board to post a new agenda, nevertheless the means chosen to notify the public of the continued meeting must be sufficient to ensure that meetings are conducted "as openly as possible" and in a manner that "protect[s] the people's right to know." HRS § 92-1.

## B.

At issue in resolving Petitioners' second question is whether the Sunshine Law permits board members to circulate written memoranda among all other members, in which board members present proposed actions, include justifications for the proposals, and seek "favorable consideration" of the proposals.

---

### 1.

Under the open meetings requirement of the Sunshine Law, "[e]very meeting of all boards shall be open to the public and all persons shall be permitted to attend any meeting unless otherwise provided in the constitution or as closed pursuant to sections 92-4 and 92-5." HRS § 92-3 (1993). A "meeting" is defined as "the convening of a board for which a quorum is required in order to make a decision or to deliberate toward a decision upon a matter over which the board has supervision, control, jurisdiction, or advisory power." HRS § 92-2(3) (1993).

The OIP and the Department of the Attorney General before it have "consistently opined that, under the Sunshine Law, board members may discuss board business only in a properly noticed public meeting unless the statute expressly allows otherwise." OIP Op. Ltr. No. 05-015, 2005 WL 2214087, at *2 (Aug. 4, 2005) (emphasis added). See OIP Op. Ltr. No. 04-04, 2004 WL 409087, at *1 (Feb. 20, 2004) ("Based upon the statute's definition of the term 'meeting,' the OIP interprets the Sunshine Law to require all discussions, deliberations and decisions relating to a matter over which the board has 'supervision, control, jurisdiction, or advisory

---

of additional notice for recessed hearing was not required by statute), or permit oral notice of continuation to be given. See generally 1 Anne T. Schwing, Open Meeting Laws 3d § 5.44(14) at 341–46 (2011) (describing state statutes requiring meetings to be continued to a time and place "as set forth in a notice posted at the place of the continued meeting and/or as announced at the original meeting"); cf. Del Greco v. Mayor of Revere, 1 Mass.App.Ct. 135, 294 N.E.2d 594, 596–97 (1973) (finding that city council has "inherent power" to "adjourn a regular meeting to a date certain without notice to absent members of the time to which the meeting has been adjourned").

26. As noted, in its 2001 opinion involving the Liquor Commission, the OIP recommended that a board "should" announce the date, time and place of the continued meeting at the time of adjournment. OIP Op. Ltr. No. 01-06, 2001 WL 1876821, at *5 (Dec. 31, 2001). In that case, the OIP found that the Liquor Commission did not in fact reconvene the original meeting, and was thus not presented with a situation in which a board conducted a series of continued meetings.

The OIP's recommendation was also made prior to the most recent amendment to HRS § 92-7(a).

27. Currently, written public notice is required for "any regular, special, or rescheduled meeting, or any executive meeting when anticipated in advance." HRS § 92-7(a) (2012). Although written public notice is not required for emergency meetings, the board is required to file an emergency agenda and reasons for its finding that "an imminent peril to the public health, safety or welfare requires" an emergency meeting with the appropriate county clerk's office(s). HRS § 92-8 (2012).

28. Meetings that are consecutively continued may pose a risk of limiting public participation to those members of the public who are able to attend every meeting and remain until the time of adjournment to hear the oral announcement. Public participation may be particularly difficult when the board takes multiple recesses during a single meeting or only meets for a few minutes in order to reschedule the meeting for another date and time without providing adequate notice of the subsequent meeting.

power' ... to occur at an open meeting unless specifically exempted.") (footnote omitted).

■ Thus, "[g]enerally speaking, discussion among board members concerning matters over which the board has supervision, control, jurisdiction or advisory power and that are before or are reasonably expected to come before the board, outside of a duly noticed meeting, violates the Sunshine Law." OIP Op. Ltr. No. 04–01, 2004 WL 232019, at *1 (Jan. 13, 2004). "That is not the case if the discussion is authorized as a permitted interaction" under HRS § 92–2.5. 2004 WL 232019, at *1.

The legislature adopted § 92–2.5 in 1996, "to expressly allow certain 'permitted interactions,' i.e., instances when board members can discuss or consider board business outside of a meeting, without notice and without public participation." OIP Op. Ltr. No. 05–015, 2005 WL 2214087, at *2. *See* 1996 Haw. Sess. Laws Act 267, § 1 at 628 ("the purpose of this Act is to specify those instances and occasions in which members of a board may discuss certain board matters ... in a manner that does not undermine the essence of open government"). "Communications, interactions, discussions, investigations, and presentations described in [HRS § 92–2.5] are not meetings for purposes" of the Sunshine Law. § 92–2.5(f) (Supp.2008).

In this case, the challenged memoranda do not fall within any of the "permitted interactions" listed in HRS § 92–2.5.[29] The MCC

---

**29.** At the relevant time, HRS § 92–2.5 (Supp. 2008) provided:

(a) Two members of a board may discuss between themselves matters relating to official board business to enable them to perform their duties faithfully, as long as no commitment to vote is made or sought and the two members do not constitute a quorum of their board.

(b) Two or more members of a board, but less than the number of members which would constitute a quorum for the board, may be assigned to:

(1) Investigate a matter relating to the official business of their board; provided that:

(A) The scope of the investigation and the scope of each member's authority are defined at a meeting of the board;

(B) All resulting findings and recommendations are presented to the board at a meeting of the board; and

(C) Deliberation and decisionmaking on the matter investigated, if any, occurs only at a duly noticed meeting of the board held subsequent to the meeting at which the findings and recommendations of the investigation were presented to the board; or

(2) Present, discuss, or negotiate any position which the board has adopted at a meeting of the board; provided that the assignment is made and the scope of each member's authority is defined at a meeting of the board prior to the presentation, discussion, or negotiation.

(c) Discussions between two or more members of a board, but less than the number of members which would constitute a quorum for the board, concerning the selection of the board's officers may be conducted in private without limitation or subsequent reporting.

(d) Discussions between the governor and one or more members of a board may be conducted in private without limitation or subsequent reporting; provided that the discussion does not relate to a matter over which a board is exercising its adjudicatory function.

(e) Discussions between two or more members of a board and the head of a department to which the board is administratively assigned may be conducted in private without limitation; provided that the discussion is limited to matters specified in section 26–35.

(f) Communications, interactions, discussions, investigations, and presentations described in this section are not meetings for purposes of this part.

HRS § 92–2.5 was amended in 2012 to add two more permitted interactions, which were numbered subsections (d) and (e), below. 2012 Haw. Sess. Laws Act 177, § 1, at 618–19. Subsections (d)-(f) in the 2008 statute were accordingly renumbered as subsections (f)-(h).

(d) Board members present at a meeting that must be canceled for lack of quorum or terminated pursuant to section 92–3.5(c) may nonetheless receive testimony and presentations on items on the agenda and question the testifiers or presenters; provided that:

(1) Deliberation or decisionmaking on any item, for which testimony or presentations are received, occurs only at a duly noticed meeting of the board held subsequent to the meeting at which the testimony and presentations were received;

(2) The members present shall create a record of the oral testimony or presentations in the same manner as would be required by section 92–9 for testimony or presentations heard during a meeting of the board; and

(3) Before its deliberation or decisionmaking at a subsequent meeting, the board shall:

(A) Provide copies of the testimony and presentations received at the canceled meeting to all members of the board; and

(B) Receive a report by the members who were present at the canceled or terminated meeting about the testimony and presentations received.

members distributed a total of fourteen memoranda among themselves in relation to the February 8, 2008 meeting and the two continued meetings on February 11 and 14. *Kanahele*, 2012 WL 2974909, at *4 (Ginoza, J., concurring). The ICA majority opinion found that "[e]ach memorandum was addressed to the other members of the MCC," and "contained a description of the proposed action, the intent and reasoning behind the proposed action, and, where a motion to amend a bill was proposed, the language sought to be deleted or added." *Id.* at *2 (majority opinion).

The only permitted interaction under § 92–2.5 that could arguably be applied is subsection (a), which provides that "[t]wo members of a board may discuss between themselves matters relating to official board business to enable them to perform their duties faithfully, as long as no commitment to vote is made or sought and the two members do not constitute a quorum of their board." HRS § 92–2.5 (Supp.2008) (emphases added). Provisions providing for exceptions to the open meetings requirement are "strictly construed against closed meetings." HRS § 92–1.

The challenged memoranda do not fall within the permitted interaction described in HRS § 92–2.5(a) because the memoranda were distributed among all of the members of the MCC rather than among only two members of the board.

In addition, the challenged memoranda sought a commitment to vote, by asking for "favorable consideration" of the proposals contained within them.

In a 2004 opinion, the OIP found that a board member's collection of signatures from other members on documents making a recommendation for action violated the Sun-

shine Law because the conduct occurred outside a public meeting, and the documents related to official business of the committee and "represent[ed] the decision of those Committee members who signed the documents." OIP Op. Ltr. No. 04–01, 2004 WL 232019, at *4 (Jan. 13, 2004). Alternatively, the board member attempted to characterize the signatures as "an opportunity for committee members to record and inform other members of their position on certain matters." *Id.* However, the OIP found that such an interaction would still be contrary to the Sunshine Law, which "requires that Committee members discuss Official Business in a meeting, not through position statements circulated outside of a meeting." *Id.* at *5 (emphasis added). The OIP reasoned,

> [T]he Legislature's intent in enacting the statute was to ensure that the formation and conduct of public policy, i.e., discussions, deliberations, decisions and actions, are conducted openly. The Sunshine Law requires that Committee members discuss Official Business in a meeting, not through position statements circulated outside of a meeting. Stated differently, the forum for "committee members to record and inform other members of their position on certain matters" is at a properly noticed meeting, not through documents such as Exhibit D and E.

*Id.* (emphases added). Thus, the OIP concluded that the board member's conduct did not fall within the permitted interaction described in § HRS 92–2.5(a). OIP Op. Ltr. No. 04–01, 2004 WL 232019, at *1.

▮▮▮ In this case, the fourteen memoranda distributed among the MCC members in relation to the meetings on February 8, 11 and 14 clearly constituted position papers in which the members who authored the paper "record[ed] and inform[ed] other members of

(e) Two or more members of a board, but less than the number of members which would constitute a quorum for the board, may attend an informational meeting or presentation on matters relating to official board business, including a meeting of another entity, legislative hearing, convention, seminar, or community meeting; provided that the meeting or presentation is not specifically and exclusively organized for or directed toward members of the board. The board members in attendance

may participate in discussions, including discussions among themselves; provided that the discussions occur during and as part of the informational meeting or presentation; and provided further that no commitment relating to a vote on the matter is made or sought.

At the next duly noticed meeting of the board, the board members shall report their attendance and the matters presented and discussed that related to official board business at the informational meeting or presentation.

their position" on proposed amendments to the Wailea 670 bills. The memoranda were not simply "informational" in the sense that they recorded the language of the proposed amendment and delineated any additions or deletions that would be made to the language of the bills.[30] Rather, the memoranda advocated for the adoption of the proposals, by detailing the rationale and justifications for the proposals. For example, all of the memoranda distributed in preparation for the February 14, 2008 MCC meeting cited the Honua'ula representative's comments at the prior meeting as justification for the proposed motions for reconsideration.

In addition, HRS § 92–2.5(a) expressly states that "[t]wo members of a board may discuss between themselves matters relating to official board business to enable them to perform their duties faithfully, <u>as long as no commitment to vote is</u> made or <u>sought.</u>" (Emphases added). The challenged memoranda explicitly sought a commitment to vote, by concluding with the statement: "I would appreciate your favorable consideration of my proposal(s). Should you have any questions, please contact me or the Committee staff[.]" Asking for "favorable consideration" is clearly equivalent to seeking an affirmative vote on the proposal.

Thus the ICA majority opinion and the circuit court erred in characterizing the memoranda as "one-way communication[s]" or "informational memoranda" that did not solicit a vote or commitment to vote. *Kanahele*, 2012 WL 2974909, at *3. *See Fujimoto v. Au*, 95 Hawai'i 116, 137, 19 P.3d 699, 720 (2001) ("We review the trial court's conclusions of law *de novo* under the right/wrong standard.") (brackets omitted).

The solicitation of votes clearly place the challenged memoranda outside the purview of the permitted interaction under HRS § 92–2.5(a). As such, the challenged memoranda violated the Sunshine Law. *See* OIP Op. Ltr. No. 06–02, 2006 WL 1308299, at *1 (Apr. 28, 2006) (finding committee's action not authorized by HRS § 92–2.5(b)(1) (Supp. 2005) and opining that "in the absence of another permitted interaction or other exception, any discussion about Board business between Board members ... should have occurred in a properly noticed meeting of the Board").

2.

■ Additionally, even if the memoranda could be considered a "permitted interaction," the memoranda would nevertheless constitute a violation of HRS § 92–5(b) (Supp.2008), which provides: "No chance meeting, <u>permitted interaction,</u> or electronic communication shall be used to <u>circumvent the spirit or requirements of this part to make a decision or to deliberate toward a decision</u> upon a matter over which the board has supervision, control, jurisdiction, or advisory power." (Emphases added). The legislature added this limitation with respect to "permitted interactions" at the same time it adopted the permitted interactions provision, 1996 Haw. Sess. Laws Act 267, § 3 at 629, specifically to "address[ ] any potential misuse" of HRS § 92–2.5 "to defeat the statute's purpose of protecting the public's right to know[.]" OIP Op. Ltr. No. 05–015, 2005 WL 2214087, at *3 (Aug. 4, 2005).

In *Right to Know Comm. v. City Council, City & Cnty. of Honolulu,* the ICA considered a case in which seven city council mem-

---

**30.** See Maui Rules of the Council Rule 19(B) and (C) (2013), *available at* http://www.co.maui.hi.us/documents/24/99/3781/Reso%2013–003_201301091239244266.pdf, providing:

B. Distributed only at a meeting. Correspondence from any source that advocates a position on a pending bill or resolution or on an amendment to a pending bill or resolution shall not be distributed by a Council member to other members, except during a meeting on the bill or resolution.

C. May be distributed outside of a meeting.

1. A Council member may propose a written amendment of a pending bill or resolution at any time to members of the Council or the relevant committee; provided, that the proposal shall only contain: (a) the text of the amendment; (b) a description of the amendment's direct effect on the bill or resolution; and (c) factual information to ensure that the proposal is appropriately processed.

2. A Council member may transmit proposed legislation to a committee with a pending item relating to the proposal's subject, provided that the transmittal shall only contain factual information to ensure that the proposal is appropriately processed.

bers co-introduced a resolution to reorganize the council's standing committees. 117 Hawai'i 1, 4, 175 P.3d 111, 113 (App.2007). The issue was whether HRS § 92–2.5(a) (Supp. 2006) permitted council members to privately discuss council business through a series of one-on-one conversations outside of a duly noticed public meeting. 117 Hawai'i at 3–4, 175 P.3d at 113–14.

Despite finding that HRS § 92–2.5(a) did not "expressly preclude" such conduct, the ICA found that HRS § 92–5(b) (Supp.2006) "provide[d] support for concluding that the one-on-one communications used to deliberate [on the resolution] were improper." 117 Hawai'i at 11, 175 P.3d at 121 (footnote omitted). The court explained that pursuant to § 92–5(b), "when the public body engages in conduct that may not violate any of the specific provisions in HRS §§ 92–1 through 92–13 (1993), but nevertheless 'circumvents the spirit or requirements' of the Sunshine Law, that conduct is impermissible." 117 Hawai'i at 11, 175 P.3d at 121. The court, relying on the policy declaration in HRS § 92–1 (1993), explained that the serial communications regarding Council business circumvented "the spirit of the open meeting requirement" and "thwarted and frustrated" the "strong policy of having public bodies deliberate and decide its business in view of the public[.]" *Id.* at 12, 175 P.3d at 122.

The OIP, which had addressed the validity of the Council's resolution prior to the commencement of the civil suit in *Right to Know*, similarly opined that the "[s]erial communications could not be a clearer example of the use of a permitted interaction to circumvent both the letter and the spirit of the Sunshine Law in direct contravention to section 92–5(b)." [31] OIP Op. Ltr. No. 05–015, 2005 WL 2214087, at *4 (Aug. 4, 2005). The OIP explained that "the council members privately discussed council business and thereafter approved the Resolution without any substantive discussion or deliberation, giving the public no understanding of, for instance, the reasons" for the passage of the resolution. *Id.* Thus, the city council essentially " 'rubber stamped' a decision that had obviously been made prior to the meeting through private one-on-one discussions." *Id.*

Although there is a practical benefit to reducing lengthy and complex proposals to writing, "[o]ur statute's very purpose is to protect the public's right to be present during the Council's discussion of council business, with the exception of very specific instances provided, which the legislature expressly directed shall be strictly construed against closed meetings." *Id.* (quotation marks omitted). In this case, the memoranda did not simply memorialize the council members' proposed amendments.[32]

As stated, the solicitation of votes is clearly prohibited by HRS § 92–2.5(a), which provides that two board members may discuss board business "as long as no commitment to vote" is "sought." This prohibition was violated by the challenged memoranda, which contained a solicitation for votes in the concluding paragraph of every memorandum. This solicitation, in addition to taking the memoranda outside the realm of a permitted interaction, is also the clearest example of the way in which the memoranda were used to "circumvent the spirit" of the Sunshine Law "to make a decision or to deliberate toward a decision" on a matter before the

31. The ICA held that the OIP's opinion was not palpably erroneous. *Right to Know*, 117 Hawai'i at 13, 175 P.3d at 123.

32. It is noted that the Florida Attorney General has opined that city council members "may prepare and distribute their own position statements to other council members without violating the Government in the Sunshine Law so long as the council members avoid any discussion or debate among themselves on these statements." Fla. Op. Att'y Gen. 2001–21, 2001 WL 276607, at *1 (Mar. 20, 2001). The position statements at issue in that opinion did not "solicit comments or responses from other council members" and cop-

ies were placed "in a public records file" accessible to the public and the press. *Id.* However, the Attorney General stated that the office "strongly discourage[d] such activity" and that "it would be a better practice to discuss commissioners' individual positions on matters coming before the board during the course of an open meeting." *Id.* at *1, *3. *See* Fla. Op. Att'y Gen.2007–35, 2007 WL 2461925, at *2 (Aug. 28, 2007) (members may send "documents that the [member] wishes other members" to consider on board matters, "provided that there is no response from, or interaction related to such documents" among members outside of a public meeting).

board. HRS § 92–5(b). Such conduct directly violates the policy of "[o]pening up the governmental processes to public scrutiny and participation." HRS § 92–1.

In addition, although the circuit court found no evidence of interactions among the members outside of a noticed meeting in regard to the memoranda, the language of the memoranda encouraged and invited such interaction: "Should you have any questions, please contact me or the Committee staff[.]" (Emphasis added). Invitations to discuss board business outside of a duly noticed meeting also circumvent the spirit and purpose of the Sunshine Law.

The effect of the challenged memoranda was that the MCC undermined the public's ability to witness and participate in the deliberation process of bills that would have a significant impact on the community.

For example, prior to the February 14, 2008 MCC meeting, eight memoranda were distributed amongst the Council members, detailing proposed motions for reconsideration of votes to amend the Wailea 670 bills that had been taken at the prior meeting. "[A]n affirmative decision on [a] motion to reconsider, even if done without substantive discussion, has substantive effect: It in essence 'wipes the slate clean,' opening up the underlying question for consideration as if no action had been taken." OIP Op. Ltr. No. 07–02, 2007 WL 550326, at *3 (Feb. 2, 2007). The OIP, in the context of considering motions to reconsider the city council's adoption of bills, noted that such motions are not "purely procedural." [33] *Id.*

At the February 14 meeting, some of the motions for reconsideration that were detailed in the members' memoranda were passed with little to no discussion. The motion to reconsider the MCC's vote requiring Honua'ula to provide a bond assuring compliance with zoning conditions was passed with no discussion on the merits of reconsidering the vote, although there was significant discussion on the merits of requiring a bond following the vote for reconsideration. In this manner, the MCC decided to reconsider

many of the amendments passed at the prior meeting based on justifications set forth in memoranda distributed outside of a public meeting.

Where the "express premise" of the Sunshine Law is that opening up the government process to public scrutiny is the only viable and reasonable way to protect the public, the MCC violated the Sunshine Law by circulating written justifications of their proposed actions, effectively limiting public scrutiny of the MCC's rationale for passing the Wailea 670 bills and the factors that ultimately led to the MCC's decision. Thus, assuming that the challenged memoranda constituted a permitted interaction, the memoranda violated the mandate under HRS § 92–5(b) that no permitted interaction be used to circumvent the spirit or requirements of the Sunshine Law to make a decision or to deliberate toward a decision upon board business.

## C.

Upon finding that the challenged memoranda violated the Sunshine Law, the ICA concurring opinion found that the violation did not mandate voiding any action of the MCC pursuant to HRS § 92–11 (2012), which provides that "[a]ny final action taken in violation of sections 92–3 and 92–7 may be voidable upon proof of violation[,]" if such suit is commenced within ninety days of the action. *Kanahele*, 2012 WL 2974909, at *6–7 (Ginoza, J., concurring). The concurring opinion explained that in this case, no "final action" was taken in violation of HRS § 92–3, as the challenged memoranda "related to the council's first reading of the Wailea 670 bills, there was a subsequent second reading and passage of the bills on March 18, 2008, and [Petitioners] raise no challenge to the conduct of the March 18, 2008 council proceedings[.]" *Id.* at *6.

Because HRS § 92–3 or § 92–7 must be violated in order to invoke the voidability provision, the ICA concurring opinion, in reaching the question of voidability, implicitly concluded that interaction among board

---

**33.** The OIP ultimately opined that "the Sunshine Law required the Council to specifically list motions to reconsider [the bills] in an agenda filed more than six calendar days prior to the meeting at which the Motions to Reconsider would be considered." *Id.* at *4.

members that does not fall within HRS § 92–2.5 constitutes a "closed meeting," or otherwise violates the open meetings requirement under HRS § 92–3. This conclusion is consistent with the position taken by the OIP, which has opined that discussions among board members concerning board business that are not permitted by HRS § 92–2.5 or violate HRS § 92–5(b), renders the board's action(s) voidable under HRS § 92–11. See OIP Op. Ltr. No. 05–015, 2005 WL 2214087, at *4 (Aug. 4, 2005) (finding serial one-on-one discussions were not permitted by HRS § 92–2.5(a) and directly violated § 92–5(b), and concluding "that the Council's approval of the Resolution and matters flowing therefrom are voidable"); OIP Op. Ltr. No. 04–01, 2004 WL 232019, at *7 (Jan. 13, 2004) (finding Sunshine Law violated by discussions and obtaining of signatures from members "outside of a duly noticed meeting or permitted interaction," and recommending "that any action taken by the Committee described herein as being contrary to the statute should be voided").

We need not resolve whether the distribution of memoranda among board members, which does not fall within a permitted interaction or violates HRS § 92–5(b), constitutes a violation of § 92–3, so as to trigger the voidability analysis under § 92–11. Rather, we determine that Petitioners did not appeal from a "final action" within the meaning of § 92–11 with respect to the challenged memoranda.

Petitioners' complaint was filed on March 5, 2008. The challenged memoranda were distributed and discussed at the MCC meetings convened on February 8, 11 and 14, 2008. Petitioners' complaint asked the circuit court to void actions taken at the February 14 meeting, when the MCC voted to pass the Wailea 670 bills on first reading. Petitioners never challenged the MCC's second reading of the bills on March 18, 2008. Thus, the circuit court did not address or rule upon any actions taken by the MCC following the first reading of the bills.

As noted by the ICA concurrence, the Sunshine Law does not define the term "final action." Kanahele, 2012 WL 2974909, at *6. The term "final," when used in the context of

a "judgment at law," means "not requiring any further judicial action" or "concluded." Black's Law Dictionary 705 (9th ed. 2009). See Gillan v. Gov't Emps. Ins. Co., 119 Hawai'i 109, 115, 194 P.3d 1071, 1077 (2008) (court may reference legal or well-accepted dictionaries to determine ordinary meaning of statutory term in absence of statutory definition). See also Lindinha v. Hilo Coast Processing Co., 104 Hawai'i 164, 168, 86 P.3d 973, 977 (2004) ("Generally, a final order is an order ending the proceedings, leaving nothing further to be accomplished.") (quotation marks omitted).

When the Sunshine Law was adopted in 1975, the legislature placed a ninety-day limit on the voidability provision. The Judiciary Committee explained that "[v]iolations cannot be made to render administrative action invalid without durational limitations." S. Stand. Comm. Rep. No. 878, in 1975 Senate Journal, at 1178. "Otherwise, administrative actions would be robbed of all sense of finality." Id.

The OIP has stated that "[w]here a bill has been acted upon after second and final reading, a motion to reconsider that action must be viewed" as an item of reasonably major importance affecting a significant number of people "because the potential effect of that motion is to re-open for consideration and action a bill that has already received a 'final' vote—likely after considerable debate and public testimony." OIP Op. Ltr. No. 07–02, 2007 WL 550326, at *4 (Feb. 2, 2007) (emphases added).

Accordingly, we agree with the ICA concurring opinion's definition of the term "final action," by its plain meaning, to mean "the final act required to carry out the board's authority on a matter." However, the term "act" could be construed broadly to mean the last ministerial or administrative act. Cf. Kleinberg v. Bd. of Educ. of the Albuquerque Public Sch., 107 N.M. 38, 751 P.2d 722, 727 (App.1988) ("Construction of the term 'final act' to mean the last ministerial act taken could lead to unreasonable, if not absurd, results."). For example, a final "act" could be construed to mean the publishing of the board's decision or the date on which the

written report of the board's findings is issued.

Other states have defined "final action," in the context of the open meetings law, to mean a "collective positive or negative decision" or an actual "vote" by the governing body on a motion, proposal, resolution, order, or ordinance. *See* Ind.Code § 5–14–1.5–2(g) (West, Westlaw through 2013 Act 1102) ("a vote by the governing body on any motion, proposal, resolution, rule, regulation, ordinance, or order"); Wash. Rev.Code § 42.30.020(3) (West, Westlaw through 1985 Act 366) ("a collective positive or negative decision, or an actual vote by a majority of the members of a governing body ... upon a motion, proposal, resolution, order, or ordinance"). *See also* Cal. Gov't Code § 11122 (West, Westlaw through 1981 Act 968) (" 'action taken' means a collective decision made by the members of a state body, a collective commitment or promise by the members ... to make a positive or negative decision or an actual vote by the members ... upon a motion, proposal, resolution, order or similar action"); Cal. Gov't Code § 54952.6 (West, Westlaw through 1961 Act 1671) (" 'action taken' means a collective decision made by a majority of the members of a legislative body, a collective commitment or promise by a majority ... to make a positive or a negative decision, or an actual vote ... upon a motion, proposal, resolution, order or ordinance"); Ky.Rev.Stat. Ann. § 61.805(3) (West, Westlaw through 1994 Act 245) (" 'Action taken' means a collective decision, a commitment or promise to make a positive or negative decision, or an actual vote by a majority of the members of the governmental body"); Neb.Rev.Stat. § 84–1410(2) (West, Westlaw through 2012 Act 995) (for purposes of section on closed sessions, "formal action shall mean a collective decision or ... commitment or promise to make a decision on any question, motion, proposal, resolution, order, or ordinance or formation of a position or policy"); 65 Pa. Cons.Stat. § 703 (West, Westlaw through 2004 Act 88) (defining "official action" to mean recommendations, establishment of policy, decisions on

agency business, or a vote taken "on any motion, proposal, resolution, rule, regulation, ordinance, report or order"); Wyo. Stat. Ann. § 16–4–402(a)(i) (West, Westlaw through 2012 Act 63) (" 'Action' ... includ[es] a collective decision, a collective commitment or promise to make a positive or negative decision, or an actual vote upon a motion, proposal, resolution, regulation, rule, order or ordinance at a meeting").

▇▇ Thus, we clarify the definition provided by the ICA concurring opinion and define "final action" in the context of HRS § 92–11 to mean "the final <u>vote</u> required to carry out the board's authority on a matter." [34] Accordingly, the MCC's first reading of the Wailea 670 bills did not constitute a "final action" that is subject to invalidation under HRS § 92–11, as a second and final reading was required under the Maui County Charter for the MCC to carry out its authority on the matter. *See* Charter of the County of Maui § 4–2(1) (2013) ("Every proposed ordinance shall be initiated as a bill and shall be passed after two readings on separate days").

This is not to suggest, however, that HRS § 92–11 applies only to meetings at which a "final action" is taken, or that any actions taken in violation of the Sunshine Law during meetings or discussions prior to "final action" are "cured" if the final action is taken in compliance with the Sunshine Law. To limit the remedy of HRS § 92–11 in a manner that divorces the board's deliberation process from its final action would be contrary to the declaration of policy and intent in HRS § 92–1, which provides that "governmental processes," including "discussions" and "deliberations," shall be conducted as openly as possible. *See State v. City of Hailey,* 102 Idaho 511, 633 P.2d 576, 581 (1981) (Bistline, J., dissenting) ("It ought not to be presumed that the legislature would define 'meeting' to include deliberative sessions but then limit the Act's remedy to meetings at which decisions are actually 'made' or, of even less moment, announced.")

---

34. Thus, multiple "final actions" may be taken in the course of approving a bill, as multiple committees or boards may be required under the relevant charter to authorize the bill's continued progress.

(footnote omitted); *Sacramento Newspaper Guild v. Sacramento Cnty. Bd. of Supervisors*, 263 Cal.App.2d 41, 69 Cal.Rptr. 480, 487 (1968) ("Only by embracing the collective inquiry and discussion stages, as well as the ultimate step of official action, can an open meeting regulation frustrate these evasive devices.") (footnote omitted).

In this case, we define "final action" for the limited purpose of determining that a complaint seeking invalidation was not filed within ninety days of a "final action" as required by HRS § 92–11. We do not define "final action" for the purpose of defining what constitutes a <u>violation</u> of the Sunshine Law.[35]

We recognize that other states have adopted many different approaches to invalidation based on violations of open meetings law.[36] However, we expressly decline to adopt a standard for determining when a violation of the Sunshine Law would warrant invalidation under HRS § 92–11.[37]

Based on the foregoing, we hold that the MCC's February 14, 2008 vote to pass the Wailea 670 bills on first reading, where the bills were required to pass a second and final reading, did not constitute a "final action" within the meaning of HRS § 92–11. Consequently, although the MCC violated the Sunshine Law by distributing the challenged memoranda in relation to the MCC meetings convened on February 8, 11 and 14, 2008, these violations do not require invalidation of the MCC's final action, voting to pass the Wailea 670 bills on March 18, 2008.

**V.**

Accordingly, the LUC and MCC did not violate the Sunshine Law by reconvening the October 18, 2007 and February 8, 2008 meetings beyond a single continuance without posting a new agenda and without accepting public oral testimony at every reconvened meeting. However, boards are required at all times to conduct continued meetings in a manner that conforms to the spirit and purpose of the Sunshine Law.

The MCC did violate the Sunshine Law by distributing written memoranda among its members outside of a duly noticed meeting, through which the members impermissibly sought a commitment to vote. In light of our conclusion that the MCC violated the Sunshine Law with respect to the challenged memoranda, we remand to the circuit court for a consideration of attorneys' fees under HRS § 92–12(c) (2012). However, for the reasons set forth above, those violations do not require invalidation of the MCC's March 18, 2008 passage of the Wailea 670 bills.

**VI.**

The ICA's October 19, 2012 Judgment on Appeal and the circuit court's January 22, 2009 Final Judgment in favor of Respondents and against Petitioners are affirmed.

---

**35.** Similarly, we do not define "final action" for purposes of administrative appeals under HRS Chapter 91.

**36.** *See* Schwing, *supra* note 25 at 901–05; 56 Am.Jur.2d *Municipal Corporations, Etc.* §§ 149–150; Peter G. Guthrie, Annotation, *Validity, Construction, and Application of Statutes Making Public Proceedings Open to the Public*, 38 A.L.R.3d 1070, 1086–88 (1971).

**37.** Specifically, we do not adopt any of the approaches to invalidation referenced in the ICA concurring opinion, which indicated that the court will not invalidate a final action if the violation was "technical," if the board "substantially complied" with the law, or if there was no demonstrated "prejudicial effect." *Kanahele,* 2012 WL 2974909, at *6–7.